FRENCH et ux. v. SOUTHWESTERN TEL-
EGRAPH & TELEPHONE CO.

(Court of Civil Appeals of Texas. El Paso.
Dec. 4, 1913. Rehearing Denied
Jan. 8, 1914.)

1. MASTER AND SERVANT (§ 286*)—INJURIES
—JURY QUESTION—NEGLIGENCE.

In an action for a lineman's death while
descending from a platform suspended on a
messenger wire by a line passing over a pulley
attached to an open hook, by the hook slipping
off, whether defendant employer was negligent
in using an open hook *held* a jury question.

[Ed. Note.—For other cases, see Master and
Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–
1015, 1017–1033, 1036–1042, 1044, 1046–1050;
Dec. Dig. § 286.*]

2. MASTER AND SERVANT (§§ 101, 102*)—MAS-
TER'S DUTY—SAFE APPLIANCES.

A master is not required to furnish the
newest or safest appliances.

[Ed. Note.—For other cases, see Master and
Servant, Cent. Dig. §§ 135, 171, 174, 178–184,
192; Dec. Dig. §§ 101, 102.*]

3. MASTER AND SERVANT (§ 105*) — NEGLI-
GENCE—CUSTOM OF EMPLOYERS.

The fact that defendant and other employ-
ers had habitually used a certain kind of appli-
ance does not of itself show that they were not
negligent in doing so, the question being wheth-
er defendant exercised ordinary care in using
that particular appliance.

[Ed. Note.—For other cases, see Master and
Servant, Cent. Dig. §§ 185–191; Dec. Dig. §
105.*]

McKenzie, J., dissenting.

Appeal from District Court, Harris Coun-
ty; Wm. Masterson, Judge.

Action by J. E. French and wife against
the Southwestern Telegraph & Telephone
Company. From a judgment for defendant,
plaintiffs appeal. Reversed and remanded.

Ring, Carothers & Brown, of Houston, for
appellants. Harris & Harris, of Houston, for
appellee.

HIGGINS, J. This suit was brought
against appellee by J. E. French and wife
to recover damages on account of the death
of John W. French, Jr., their son, who
fell and was killed, while in the employ of
appellee, on October 28, 1911. It was alleged
that the deceased was under the direction of
one of defendant's foremen and vice princi-
pal, Adrian Hall, and was engaged in re-
pairing and connecting wires used by the
defendant at the intersection of Walnut and
Providence streets in the city of Houston;
that, in doing said work, it was necessary
that Hall and the deceased make use of a
platform suspended from a messenger wire
holding a cable of defendant, and, at the
time of the casualty, such platform was sus-
pended midway between the posts of the com-
pany and about 30 feet from the ground.
That, for the purpose of reaching the plat-
form and of conveying material from the
ground thereto and of descending there-
from to the ground, the defendant had fur-
nished to Hall, for the use of himself and
of deceased a hand line consisting of a

pulley with a rope running through the
same, the pulley being attached to one of
the messenger wires by means of an open
hook. That, acting under the orders of
Hall and within the scope of his employ-
ment, deceased, in attempting to come from
the platform down to the ground, made use
of said hand line, and, while he was so doing,
the hook by which the pulley and hand line
was attached to such messenger wire slipped
and came off of the same, and, by reason
thereof, the deceased fell to the ground and
received the injury which resulted in his
death; that said hook was not reasonably
safe for the purposes for which it was used,
in that it had no safety catch or device of
any kind attached thereto to insure its stay-
ing and holding on the messenger wire when
weight was applied to it, and that, in this
respect, the defendant was negligent, and
such negligence was the proximate cause of
the death of the deceased. It was further
alleged that defendant knew of the unsafe
character of said hook, and that it was not
reasonably safe to use for the purposes for
which it was used, and that the deceased was
a minor, inexperienced and unaware of the
danger attending the use of the hand line
and hook in its said condition, without a
safety appliance or of the chances of in-
jury resulting from such use. That it was
customary for defendant's employés engaged
in similar work to make use of the hand line,
which was well known to defendant, and
that the defendant knew and should have
known that deceased would probably use
the same in descending from the platform.
That it was the duty of defendant to warn
the deceased of the dangers incident to such
use, and that the defendant had failed to do
so, which failure to warn was likewise neg-
ligent and the proximate cause of the death
of the deceased. Defendant answered by
general denial and special pleas of assumed
risk and contributory negligence. At the
close of plaintiff's testimony, the court per-
emptorily instructed in defendant's favor, in
accordance wherewith verdict was returned
and judgment rendered.

The evidence bearing upon the questions
presented by this appeal is that of Adrian
Hall, with whom deceased was working as a
helper at the time his injuries were received.
Hall's entire testimony is: "My name is
Adrian Hall, and I am in the employ of the
Southwestern Telegraph & Telephone Com-
pany. I have been working for this company
off and on for, I guess, three and one half
or four years. I was working for them on
the 28th day of October, 1911. I had been
working for the telephone company for three
years, I guess, at the time that Mr. French
is alleged to have fallen and been killed. My
duties at that time were those of a cable
splicer. A cable splicer's duty is to splice
cable. The cable is a bunch of wires carrying
electricity and the cable is suspended from

the telephone poles and from pole to pole by messenger clips that hold the cable to the 'messenger.' The messenger wire is a big steel wire which is stretched from pole to pole and the cable is suspended from the messenger wire and under the messenger wire. The cable is a heavy lead cable incasing the bunch of wires carrying the electricity. I was the man with John W. French, and he was working for the Southwestern Telegraph and Telephone Company at the time he was killed. He was a helper helping me. I don't remember how long he had been working under me, it was several months, though. I don't remember how long it was. He had worked under me from the time he started in with the company, and had never worked under any one else that I know of, unless it was the days that I was off, or something, he might have helped some one else. He was my helper and was the only man I had helping me. While he was helping me he was under my orders. The platform that we work on when we are splicing these wires is fastened to the messenger with straps that we go and snap on there. One end snaps to the corner of the platform and one to the messenger. There are four of them, one on each corner. I don't know whether you would call them hooks or not. I call them a snap. (Counsel here hands witness some straps, hooks, etc.) This is the hook by which the platform was fastened to the messenger. This hook snaps onto the platform, then it hooks over the messenger, one on each corner, there are four of them. On the day that Mr. French fell I was working on the corner of Providence and Walnut streets in the Fifth ward, Houston, Tex. The wire I was working on was running up and down Walnut street, and Walnut street, I would think, would run east and west. I would think that Providence street runs north and south. I was right at the corner, you might say. The wire that runs on Providence street crosses the wire that I was working on. I don't know which wire crosses over the end; I know they cross there. I was working about four feet, I should judge, from the intersection of these wires where they crossed each other. I didn't measure how high that was from the ground, but I would judge it to be about 35 feet. I think the nearest telephone pole was 12 or 15 feet away. (Counsel here handed to witness the hand line admitted to have been used by French the day he fell and asked him to explain its use to the jury.) This (hand line) is hooked on the messenger to draw stuff up that I use. You see, if you get it tight you can pull it down and pull it back up by the other side. One hook is hooked over the messenger wire, and the other hook is used in drawing up the material from the ground. We began work at about 7:30 the morning that French was injured. I don't know that we were right there when we began. We had worked from then to 15

minutes to 12, and that was the time of day when he fell. French had a watch and pulled it out and said it was 15 minutes to 12 when he started down. I don't know whether it is customary for men working in my position to use that hand line for descending from the platform to the ground; I have used it myself. When it was a distance away from a pole and it was hard to get to it, I always used it myself. On the pole closest to us there were some light wires running along up this pole on each side of the pole. I mean electric light wires. It is dangerous for a man to get shocked by the current they carry. If you get hold of one that is hot enough, it is enough to kill a man and is likely to kill you. They carry heavy enough current to kill you. 1 had been down to the ground after I had ascended to the platform that morning. When I went down, I went down on the hand line. Young French had been down from the platform that morning. He, too, went down the hand line. As near as I can recollect, French met his death in this way: I told him to go down and test the cable box with me, and he started down and was getting my cable to test with when we got there, and I went on and opened up my cable, and I heard the block and tackle and I saw him falling. That is all I know of how it happened. I did not have my back to him when he started down the hand line. I had my face to him, but was not looking at him. I was looking at the cable. When he started down the hand line he had got off the platform. We were on the platform when I told him to go down to the ground. He started down by the hand line. When I looked the hand line was loose from the messenger wire and was descending to the ground with him. When I saw him fall, I got down as quick as I could. They carried him over in the shade of a flat; there was a pretty good crowd around, so some lady told me to go and get some camphor, and while I was over there I heard the ambulance coming, and I rang my foreman and told him he was hurt; I didn't know how bad he was hurt. I saw him after that in the infirmary. I think it was the next morning that he died; I was there that night. I had never told young French not to go down this hand line, that it was dangerous. I had never been told not to use the line for the purpose of descending from the platform. I always used it for the purpose of coming down when I was some distance away from a pole. (Witness here made measurements of the hand line, the hooks attached to it, the straps, etc., in use for the platform.) The depth of the hook by which the hand line was attached to the messenger is about two inches or a little more. The inside measurement of the hook from side to side across the bottom is about three quarters of an inch and across the top at the widest place is about an inch. From the

point of the hook to the top of the opening on the inside is about two inches. The hand line is about a quarter of an inch or more in diameter. It measures about two inches in circumference. The other hook attached to the hand line by which we draw up the material measures about two inches from the point of the hook to the top of the opening. (Counsel here hands witness another rule and witness remeasures the hook used for drawing up the material.) By this rule the distance is a little over two inches. By this rule the measurement from the point of the hook attached to the messenger wire to the top of the opening is about one and three-fourths inches. The measurement across the top part of the larger hook is a little over an inch. The measurement across the top of the other hook is just about an inch. This rope (indicating) is a guy line to guy the platform down and hold it steady. The guy line has the same kind of hook as is on the straps. There is on the guy line what I suppose you would call a safety catch. It is a closed hook to close the snap. The purpose of putting that snap on the hook and the reason it is put on there is it is supposed to keep it from coming loose and to keep it from slipping off. The hook on the hand line has no safety catch on it. The platform we were working on that day was, I suppose, about four feet long and about two and one-half to three feet wide. I don't know exactly what it is. Cross-examination. The leather strap and hook is the kind that the telephone company ordinarily uses in its work. The guy line is the kind the telephone company ordinarily uses in its work. The hook and the pulley and the hand line John W. French used the day he was killed are the kind of a hook and the kind of a pulley and the kind of hand line that is generally used in that work. I never in all my life saw them use any other kind of one except this. I never in all my life saw a hook like that go over a messenger wire with a clip on it like that. Redirect examination. When I reached the ground I found the hook that had been fastened over the messenger wire by which the hand line was suspended from the messenger wire lying on the sidewalk. I never noticed whether it fell on top of French or underneath him, or how it did fall, but the hook fell with him. Mr. French was working with me practically all the time from the time that he went into the employment of the Southwestern Telegraph & Telephone Company, except the days that I was off. I don't remember how often I was off, but I wasn't off very much. I directed this man to go down to the ground that day. I did not tell him how to go. He usually went down the hand line when he was away from the pole a distance like that."

[1] From a perusal of the foregoing testimony, it is obvious that, in some unexplained manner, the hook attaching the pulley to the messenger wire became detached, and, when French attempted to descend by the hand line, the pulley fell, and he was precipitated to the ground. The hook was an open one, and it is quite obvious further that, if it had been protected by a safety device such as was used on the hooks or snaps attached to the platform, the danger of it becoming disengaged from the messenger wire would at least have been materially lessened. These patent facts raise an issue of negligence vel non upon the part of appellee in using an open hook, and such issue should have been submitted to the jury.

Appellee contends that plaintiff, in cases of this character, must establish a prima facie case of negligence; that the mere happening of an accident or occurrence of an injury, of itself, does not raise an issue as between employer and employé. Ordinarily, this is quite true, but from the evidence recited, it is a patent fact that a safety device closing the open space in the hook would have at least materially reduced the likelihood of its becoming disengaged and precipitating ascending and descending loads to the ground.

[2] An issue of negligence is therefore raised, but it is further insisted, in this connection, that the master is not required to furnish the newest, safest, or best appliances and machinery for his servants to work with; and that the cross-examination of Hall, having disclosed that the hook, pulley, and hand line used by deceased was the kind ordinarily used by appellee and generally used by other companies, and that he had never seen a hook go over a messenger wire with a safety clip upon it, acquits the appellee of any inference of negligence which might otherwise arise under the circumstances from the use of the open hook. The legal principle asserted is correct, but it has no application to the facts proven. The question is: Was the use of the open hook such care and caution as an ordinarily prudent person would have used under the same circumstances?

[3] The fact that appellee and other companies had habitually and customarily used the same does not, of itself, show that they had exercised ordinary care. The rule is so aptly stated in Morgan v. Ry. Co., 50 Tex. Civ. App. 420, 110 S. W. 978, that we quote from the opinion as follows: "The appellants offered to prove by J. M. Byrnes that he was familiar with the method of construction of the various compresses in Texas, and their platforms, and familiar with the location of same with reference to railway tracks, and with the method of their operation and of handling and storing cotton on their platforms, and that the construction and location of the compress at La Grange was practically identical with that of said other compresses in Texas, and that the method in use by the La Grange & Lockhart Compress Company in the storage of cotton in its compress and on its platforms, and in the handling of cotton in its compress at

the time of the fire, was the same as in use at all other compresses. The court sustained an objection to the testimony, and appellants reserved a bill of exception, and this action of the court is made the basis of their twenty-eighth assignment of error. Appellants contend that, as the compress in question was constructed just as every other compress was in Texas, and its cotton handled just as every other compress in Texas handled cotton, the La Grange & Lockhart Compress Company could not have been guilty of negligence, because, if it did as every other compress company did, its action would constitute ordinary prudence. The assignment is without merit. The habitual practice of any number of compresses, for any period of time, cannot make a negligent act an act of due care and diligence. The test is, Did the compress company exercise ordinary care, that is, such care and caution in the storing or handling of cotton as a person of ordinary prudence would have exercised under the same circumstances?" The case of Lyon v. Bedgood, 54 Tex. Civ. App. 19, 117 S. W. 900, is very much in point. The negligence relied on in that case was the failure to equip a turnbuckle with jam nuts at each end to prevent the turnbuckle from unscrewing and coming loose. The jam nut was a safety device very similar in its purpose to the safety device on the hook. The defendant contended that, as the equipment of the defendant was similar to that in use by other companies, they were not negligent in failing to use the jam nut, but the court overruled this contention, and held that the question whether or not the failure to use the jam nut was negligence upon which the plaintiff might recover was a question of fact for the jury and not one of law for the court. In the case last mentioned, the court says: "There was no error in refusing to give the requested instruction that, if the equipment used by defendants was such as was in general use among reasonably prudent persons engaged in the same business, defendants were in the exercise of ordinary care in using it. We do not think this is the rule in this state. Evidence of such use by other persons engaged in the same kind of business is admissible upon the issues of ordinary care, but the question * * * is whether, under the facts of the particular case, there has been an absence of ordinary care."

It matters not, therefore, if appellee and other telegraph and telephone companies have habitually used the open hook for the purposes for which the hook here in question was used. Such habitual and continuous use will not convert negligence into ordinary care. A similar contention was likewise made in Hamilton v. Ry. Co., 36 Iowa, 31, where an employé, while attempting to couple a car, was injured by a projecting timber. The defendant company requested the following charge: "If the car of timber which hurt the plaintiff was loaded as loads of timber had been usually and commonly loaded and carried over defendant's and all other railroads, then it was not negligence in defendant to carry timber upon which the plaintiff was hurt." In disposing of the instruction, the court says: "The instruction was properly refused, for the obvious reason that habits of negligence on the part of the defendant or other railroads will not relieve them from the consequences of their own negligent acts. If, because an act is usual and common, it ceases to be negligent, it follows that the sure way of escaping liability from injuries, in cases of this character, would be to adopt a certain and uniform system of carelessness."

In further support of the views here expressed upon the impropriety of the peremptory instruction, see, also, Ry. Co. v. Neef, 138 S. W. 1168; Oil Co. v. Snell, 47 Tex. Civ. App. 413, 106 S. W. 173; Ry. Co. v. Wortham, 73 Tex. 25, 10 S. W. 741, 3 L. R. A. 368; Ry. Co. v. Evansich, 61 Tex. 5; Ry. Co. v. Smith, 87 Tex. 348, 28 S. W. 520; Fuchs v. City of St. Louis, 133 Mo. 168, 31 S. W. 115, 34 S. W. 508, 34 L. R. A. 118.

Reversed and remanded.

McKENZIE, J. (dissenting). The majority opinion sufficiently states the pleadings and sets out the evidence. It is upon Hall's testimony that appellants seek a recovery. The record shows that French was about 20 years old, had been in appellee's employ for several months, working as Hall's helper, in work similar to that which was being done the day he met his death. The work, the kind of work, the pulley, the hook on the pulley, and the line used in going from the ground to the place of work and in returning thereto are described in Hall's testimony. All that is known of how young French met his death is told by Hall in these words: "We began work at about 7:30 the morning that French was injured. I don't know that we were right there when we began. We had worked from then to 15 minutes to 12, and that was the time of day when he fell. French had a watch and pulled it out and said it was 15 minutes to 12 when he started down. I don't know whether it is customary for men working in my position to use that hand line for descending from the platform to the ground; I have used it myself. When I was a distance away from a pole and it was hard to get to it, I always used it myself. I had been down to the ground after I had ascended to the platform that morning. When I went down, I went down on the hand line. Young French had been down from the platform that morning. He, too, went down the hand line. As near as I can recollect, French met his death in this way: I told him to go down and test the cable box with me, and he started down,

and was getting my cable to test with when we got there, and I went on and opened up my cable, and I heard the block and tackle and I saw him falling. That is all I know of how it happened. I did not have my back to him when he started down the hand line. I had my face to him, but was not looking at him. I was looking at the cable. When he started down the hand line he had got off the platform. We were on the platform when I told him to go down to the ground. He started down by the hand line. When I looked the hand line was loose from the messenger wire and was descending to the ground with him."

In T. & N. O. Ry. Co. v. Crowder, 63 Tex. 503, our Supreme Court announced with approval the rule that: "The servant seeking to recover for an injury takes the burden upon himself of establishing negligence on the part of the master, and due care on his own part." Under this rule it is there held that the plaintiff is required to show the facts surrounding and leading to the injury, and if, from them, the jury can reasonably infer negligence in the employer contributing to the injury, and the exercise of due care by plaintiff, then he is entitled to recover. If the evidence does not show how the accident occurred by which he was injured, by showing his own relation to it and other surrounding facts, some or all of which may appear from the character of the accident itself, he has not gone as far as the law requires him to go to entitle him to recover. That because the action to recover is prosecuted by a relation of the injured party does not alter the rule. The Crowder Case was again on appeal (see 76 Tex. 499, 13 S. W. 381), and Judge Hobby, rendering the opinion, said: "With respect to the facts in this case, upon a former appeal it was said by Chief Justice Stayton that: 'The evidence does not show what was the action of the deceased at the time he was injured, nor so develop the facts as to show that he was in the exercise of due care;' and again, that: 'The true rule in this class of cases is that the servant seeking to recover for an injury takes the burden upon himself of establishing negligence on the part of the master, and due care on his own part.' * * * The only difference at all material between the testimony upon the previous appeals of this cause and that contained in the record before us is that a witness, Eli Burge, for the first time testified upon the last trial as follows: 'I did not see how George Cohn was hurt. When I saw him he was sitting on the main track on the end of a tie; he was hurt on the south track. To the best of my judgment it was between 10 and 12 minutes after he was hurt before I saw him. When I got to him I found him sitting on a tie about four or five feet from where he was hurt. I suppose it was about two or three feet from one tie to another between the tracks. The rails of the two tracks were about four feet apart. His

leg was run over and cut off above the ankle. It was his left leg. I saw signs indicating how he was hurt; saw blood on the rail and tie and on the flange of the wheel of a car opposite to him, and I saw a foot track right down alongside of this bloody tie, in the angle between this tie and the inside of the rail. It seemed to me it was where Cohn put his foot down inside the track between the tie and rail. The track of the railway was unfilled at this point; the top of the tie was from eight to nine inches above the surface of the ground, and the top of the rail is five inches above the tie. There was blood on the rail and on the tie above the foot track.' No reasonable construction of this testimony as to 'the facts surrounding and leading to the accident' will authorize the conclusion or inference that the negligence of the appellant contributed to the injury, and that there was due care exercised on the part of the injured party, which, under the rule laid down in this case heretofore, was held to be essential for the appellees to establish to entitle her to a recovery. See Railway v. Crowder, 63 Tex. 504, 505. Under the facts of this case as now presented, we think the charge requested instructing the jury to find for the defendant should have been given; and, if upon another trial the evidence is of the same character as that now before us, a charge such as requested in this case should be given. Because it was not given, we think the judgment should be reversed and the cause remanded."

I am of opinion, as said in the Crowder Case, 76 Tex., supra, that "no reasonable construction of this testimony as to the facts surrounding and leading to the accident will authorize the conclusion or inference that the negligence of the appellant contributed to the injury, and that there was due care exercised on the part of the injured party." Hall says, as heretofore quoted: "As near as I can recollect, French met his death in this way: I told him to go down and test the cable box with me, and he started down (and was getting my cable to test with when we got there) and I went on and opened up my cable, and I heard the block and tackle and I saw him falling. That is all I know of how it happened. I did not have my back to him when he started down the hand line. I had my face to him, but was not looking at him. I was looking at the cable. When he started down the hand line he had got off the platform. We were on the platform when I told him to go down to the ground. He started down by the hand line. When I looked the hand line was loose from the messenger wire and was descending to the ground with him."

It is not shown anywhere that the absence of any safety device was the cause of the hook getting off of the messenger wire. Common experience teaches that the weight upon the hook would necessarily cause the hook to stay fastened to the messenger wire, in-

stead of becoming loosened. Under the above testimony, it would be mere surmise to say that the accident was caused because the hook on the pulley was not equipped with some safety device. If, however, by a surmise it could be said that the absence of the safety device did contribute to the injury, yet there is an entire absence of testimony upon which even a surmise can be predicated, and that is, that the deceased on his part exercised due care. From my analysis of the evidence I fail to find any, by which it is shown that the deceased did exercise due care. I am therefore of opinion that this cause should be affirmed upon the two propositions, viz., that plaintiff failed in proving negligence on the part of the defendant, and that the deceased exercised due care. The burden was upon plaintiff in both instances. The mere fact that there was an accident or that an injury occurred is not proof of negligence, or that deceased exercised due care.

The majority opinion has determined also that the evidence is sufficient to raise an issue of fact as to whether the hook which fastened to the messenger wire should have been equipped with a safety device. I fail to find evidence of negligence on the part of defendant in using the hook. There is no evidence that the hook was unsafe or defective, that it broke or gave way, or that any other kind than the one in use was used by others engaged in similar business. It would seem that in this case the doctrine that the master cannot be charged with a breach of the duties owed to his servants, simply on the ground that a safer instrumentality than that from which the injury might have resulted was available and might have been adopted by him. Plaintiff's right for recovery seems to be based wholly upon the theory that the defendant could have had a safety device on the hook, yet it is not shown that such device would be practicable, or that it is a proper device to use in the kind of work which was being done when the accident occurred. For the reasons indicated, I respectfully dissent in the views of the majority, and am of opinion that this cause should be in all respects affirmed.