J. E. FRENCH ET AL. v. SOUTHWESTERN TELEGRAPH & TELEPHONE COMPANY,

No. 2627. Decided May 5, 1920.

(221 S. W., 570.)

**Negligence—Master and Servant—Peremptory Charge.**

An employee of a telephone company while engaged in repair work on its line used a platform suspended from a messenger wire carrying its

cable and in attempting to descend by a hand line carrying a pully and suspended by a hook from the messenger wire, fell and was killed, the hook slipping off from the wire. The hook sustaining the pully and hand line, which was the usual sort furnished by the company for such line, had no safety catch. From these facts, without further proof of negligence on the part of defendant, it became a question of fact for the jury whether the failure to provide for this purpose a hook with a safety catch constituted negligence. A peremptory instruction to find for defendant was unwarranted. French v. Southwestern Tel. & Teleph. Co. 162 S. W., 406, approved. (Pp. 506-513).

Question certified on dissent from the Court of Civil Appeals for the Eighth District, in an appeal from Harris County.

*Ring, Carothers & Brown*, for appellants.—There was room for a reasonable mind to conclude that ordinary care required the defendant to furnish for the use of plaintiff a hand line equipped with a safety hook, that is a hook with a safety catch or snap to prevent it from slipping from the messenger wire and endangering the lives of human beings suspended 35 feet in the air, and that failure to furnish a safety hook was negligence on the part of the defendant and the proximate cause of the death of plaintiff's son, and it was, therefore, error for the court to take this issue from the jury and direct a verdict for the defendant. Lyon v. Bedgood, 117 S. W., 900; G. C. & S. F. Ry. Co. v. Smith, 87 Texas, 359; G. C. & S. F. Ry. Co. v. Evanisch, 61 Texas, 7; Monaghan v. Pac. Roller Mill Co., 81 Cal., 190, 22 Pac., 590.

*John Charles Harris* (*Harris & Harris* of counsel) for appellee.— The burden is on plaintiff to prove negligence on the part of defendant; and the mere proof that the young man, French, fell from the platform and was killed, does not raise even a presumption of negligence on defendant's part, in the absence of proof by plaintiff of some specific negligence of act or omission on the part of defendant. Lumber Co. v. Dunham, 85 Texas, 60; Vega v. League, 64 Texas, 208; Railway Co. v. Crowder, 63 Texas, 503; Railway Co. v. Crowder, 76 Texas, 501; Murray v. Railway Co., 73 Texas, 5; Railway Co. v. Schieder, 88 Texas, 616.

MR. JUSTICE HIGGINS (JUSTICE McKENZIE dissenting) delivered the opinion of the Court of Civil Appeals as follows:

This suit was brought against appellee by J. E. French and wife to recover damages on account of the death of John W. French, Jr., their son, who fell and was killed while in the employ of appellee on October 28, 1911. It was alleged that the deceased was under the direction of one of defendant's foremen and vice-principal, Adrian Hall, and was engaged in repairing and connecting wires used by the defendant at the intersection of Walnut and Providence Streets in the city of Houston, that in doing said work, it was necessary that Hall and the deceased make use of a platform suspended ·from a messenger wire holding a cable of defendant, and at the time of the cas-

ualty, such platform was suspended midway between the posts of the company and about thirty feet from the ground. That for the purpose of reaching the platform and of conveying material from the ground thereto and of descending therefrom to the ground, the defendant had furnished to Hall for the use of himself and of deceased a hand line, consisting of a pulley with a rope running through the same, the pulley being attached to one of the messenger wires by means of an open hook. That acting under the orders of Hall and within the scope of his employment, deceased, in attempting to come from the platform down to the ground, made use of said hand line, and while he was so doing, the hook by which the pully and hand line was attached to such messenger wire, slipped and came off of the same, and by reason thereof, the deceased fell to the ground and received the injury which resulted in his death; that said hook was not reasonably safe for the purposes for which it was used, in that it had no safety catch or device of any kind attached thereto to insure its staying and holding on the messenger wire when weight was applied to it, and that in this respect, the defendant was negligent, and such negligence was the proximate cause of the death of the deceased. It was further alleged that defendant knew of the unsafe character of said hook and that it was not reasonably safe to use for the purposes for which it was used, and that the deceased was a minor, inexperienced and unaware of the danger attending the use of the hand line and hook in its said condition, without a safety appliance, or of the chances of injury resulting from such use. That it was customary for defendant's employees engaged in similar work to make use of the hand line, which was well known to defendant, and that the defendant knew and should have known that deceased would probably use the same in descending from the platform. That it was the duty of defendant to warn the deceased of the dangers incident to such use and that the defendant had failed to do so, which failure to warn was likewise negligent and the proximate cause of the death of the deceased.

Defendant answered by general denial and special pleas of assumed risk and contributory negligence. At the close of plaintiff's testimony, the Court peremptorily instructed in defendant's favor in accordance wherewith verdict was returned and judgment rendered.

The evidence bearing upon the questions presented by this appeal is that of Adrain Hall with whom deceased was working as a helper at the time his injuries were received. Hall's entire testimony is:

"My name is Adrian Hall and I am in the employ of the Southwestern Telegraph and Telephone Company. I have been working for this company off and on for I guess three and one-half or four years. I was working for them on the 28th day of October, 1911. I had been working for the telephone company for three years, I

guess, at the time that Mr. French is alleged to have fallen and been killed.    My duties at that time were those of a cable splicer.    A cable splicer's duty is to splice cable.    The cable is a bunch of wires carrying electricity and the cable is suspended from the telephone poles and from pole to pole by messenger clips that hold the cable to the 'messenger.'    The messenger wire is a big steel wire which is stretched from pole to pole and the cable is suspended from the messenger wire and under the messenger wire.    The cable is a heavy lead cable encasing the bunch of wires carrying the electricity.

"I was the man with John W. French and he was working for the Southwestern Telegraph and Telephone Company at the time he was killed.    He was a helper helping me.    I don't remember how long he had been working under me, it was several months, though. I don't remember how long it was.    He had worked under me from the time he started in with the Company and had never worked under and one else that I know of unless it was the days that I was off, or something, he might have helped some one else.    He was my helper and was the only man I had helping me.    While he was helping me he was under my orders.

"The platform that we work on when we are splicing these wires is fastened to the messenger with the straps that we go and snap on there.    One end snaps to the corner of the platform and one to the messenger.    There are four of them, one on each corner.    I don't know whether you would call them hooks or not.    I call them a snap.    (Counsel here hands witness some straps, hooks, etc.) This is the hook by which the platform was fastened to the messenger. This hook snaps onto the platform, then it hooks over the messenger, one on each corner, there are four of them.

"On the day that Mr. French fell I was working on the corner of Providence and Walnut Streets in the Fifth Ward, Houston, Texas. The wire I was working on was running up and down Walnut Street, and Walnut Street, I would think, would run east and west. I would think that Providence Street runs north and south.    I was right at the corner, you might say.    The wire that runs on Providence Street crosses the wire that I was working on.    I don't know which wire crosses over the end, I know they cross there.    I was working about four feet, I should judge, from the intersection of these wires where they crossed each other.    I didn't measure how high that was from the ground, but I would judge it to be about thirty-five feet.    I think the nearest telephone pole was twelve or fifteen feet away.

" (Counsel here handed to witness the hand-line admitted to have been used by French the day he fell and asked him to explain its use to the jury.)    This hand-line is hooked on the messenger to draw stuff up that I use.    You see, if you get it tight you can pull it down and pull it    back up by the other side.    One hook is

hooked over the messenger wire and the other hook is used in drawing up the material from the ground.

"We began work at about 7:30 the morning that French was injured. I don't know that we were right there when we began. We had worked from then to fifteen minutes to twelve and that was the time of day when he fell. French had a watch and pulled it out and said it was fifteen minutes to twelve when he started down. I don't know whether it is customary for men working in my position to use that hand line for descending from the platform to the ground; I have used it myself. When it was a distance away from a pole and it was hard to get to it, I always used it myself. On the pole closest to us there were some light wires running along up this pole on each side of the pole. I mean electric light wires. It is dangerous for a man to get shocked by the current they carry. If you get hold of one that is hot enough it is enough to kill a man and is likely to kill you. They carry heavy enough current to kill you. I had been down to the ground after I had ascended to the platform that morning. When I went down, I went down on the hand line. Young French had been down from the platform. He, too, went down the hand line. As near as I can recollect French met his death in this way: I told him to go down and test the cable box with me and he started down and was getting my cable to test with when we got there and I went on and opened up my cable, and I heard the block and tackle and I saw him falling. That is all I know of how it happened. I did not have my back to him when he started down the hand line. I had my face to him but was not looking at him. I was looking at the cable. When he started down the hand line he had got off the platform. We were on the platform when I told him to go down to the ground. He started down by the hand line. When I looked the hand line was loose from the messenger wire and was descending to the ground with him. When I saw him fall I got down as quick as I could. They carried him over in the shade of a flat; there was a pretty good crowd around, so some lady told me to go and get some camphor, and while I was over there, I heard the ambulance coming and I rang my foreman and told him he was hurt, I didn't know how bad he was hurt. I saw him after that in the infirmary. I think it was the next morning that he died; I was there that night. I had never told young French not to go down this hand line, that it was dangerous. I had never been told not to use the line for the purpose of descending from the platform. I always used it for the purpose of coming down when I was some distance away from a pole.

"(Witness here made measurements of the hand line, the hooks attached to it, the straps, etc., in use for the platform). The depth of the hook by which the hand line was attached to the messenger is about two inches or a little more. The inside measurement of the hook from side to side across the bottom is about three quarters of

an inch and across the top at the widest place is about an inch. From the point of the hook to the top of the opening on the inside is about two inches. The hand-line is about a quarter of an inch or more in diameter. It measures about two inches in circumference. The other hook attached to the hand-line by which we draw up the material measures about two inches from the point of the hook to the top of the opening. (Counsel here hands witness another rule and witness re-measures the hook used for drawing up the material). By this rule the distance is a little over two inches. By this rule the measurement from the point of the hook attached to the messenger wire to the top of the opening is about 1¼ inches. The measurement across the top part of the larger hook is a little over an inch. The measurement across the top of the other hook is just about an inch.

"This rope (indicating) is a guy line to guy the platform down and hold it steady. The guy line has the same kind of hook as is on the straps. There is on the guy line what I suppose you would call a safety catch. It is a closed hook to close the snap. The purpose of putting that snap on the hook and the reason it is put on there is it is supposed to keep it from coming loose and to keep it from slipping off. The hook on the hand-line has no safety catch on it. The platform we were working on that day was, I suppose, about four feet long and about two and one-half to three feet wide. I don't know exactly what it is.

"Cross-Examination.

"The leather strap and hook is the kind that the Telephone Company ordinarily uses in its work. The guy line is the kind the Telephone Company ordinarily uses in its work. The hook and the pulley and the hand line John W. French used the day he was killed, are the kind of a hook and the kind of a pulley and the kind of hand line that is generally used in that work. I never in all my life saw them use any other kind of one except this. I never in all my life saw a hook like that go over a messenger wire with a clip on it like that.

"Re-direct Examination.

"When I reached the ground I found the hook that had been fastened over the messenger wire by which the hand-line was suspended from the messenger wire lying on the sidewalk. I never noticed whether it fell on top of French or underneath him, or how it did fall, but the hook fell with him. Mr. French was working with me practically all the time from the time that he went into the employment of the Southwestern Telegraph and Telephone Company, except the days that I was off. I don't remember how often I was off but I wasn't off very much. I directed

this man to go down to the ground that day. I did not tell him how to go. He usually went down the hand-line when he was away from the pole a distance like that.''

From a perusal of the foregoing testimony, it is obvious that, in some unexplained manner, the hook attaching the pulley to the messenger wire, became detached, and when French attempted to descend by the hand-line, the pulley fell and he was precipitated to the ground. The hook was an open one, and it is quite obvious further, that if it had been protected by a safety device, such as was used on the hooks or snaps attached to the platform, the danger of it becoming disengaged from the messenger wire would at least, have been materially lessened. These patent facts raise an issue of negligence *vel non* upon the part of appellee in using an open hook, and such issue should have been submitted to the jury.

Appellee contends that plaintiff, in cases of this character, must establish a *prima-facie* case of negligence; that the mere happening of an accident or occurrence of an injury, of itself, does not raise such an issue as between employer and employee. Ordinarily, this is quite true, but from the evidence recited, it is a patent fact that a safety device closing the open space in the hook would have at least materially reduced the likelihood of its becoming disengaged and precipitating ascending and descending loads to the ground. An issue of negligence is therefore raised, but it is further insisted in this connection, that the master is not required to furnish the newest, safest or best appliances and machinery for his servants to work with; and that the cross examination of Hall having disclosed that the hook, pulley and hand-line used by deceased was the kind ordinarily used by appellee, and generally used by other companies, and that he had never seen a hook go over a messenger wire with a safety clip upon it, acquits the Appellee of any inference of negligence which might otherwise arise under the circumstances from the use of the open hook. The legal principle asserted is correct, but it has no application to the facts proven. The question is: Was the use of the open hook such care and caution as an ordinarily prudent person would have used under the same circumstances? The fact that appellee and other companies had habitually and customarily used the same does not, of itself, show that they had exercised ordinary care. The rule is so aptly stated in Morgan v. Ry. Co., 50 Texas Civ. App., 420, 110 S. W., 978, that we quote from the opinion as follows:

''The appellants offered to prove by J. M. Byrnes that he was familiar with the method of construction of the various compresses in Texas, and their platforms, and familiar with the location of same with reference to railway tracks, and with the method of their operation and of handling and storing cotton on their platforms, and that the construction and location of the compress at Lagrange was practically identical with that of said other compresses

in Texas, and that the method in use by the Lagrange & Lockhart Compress Company in the storage of cotton in its compress and on its platforms, and in the handling of cotton in its compress at the time of the fire, was the same as in use at all other compresses. The court sustained an objection to the testimony, and appellants reserved a bill of exception, and this action of the court is made the basis of their twenty-eighth assignment of error. Appellants contend that, as the compress in question was constructed just as every other compress was in Texas, and its cotton handled just as every compress in Texas handled cotton, the Lagrange & Lockhart Compress Company could not have been guilty of negligence, because, if it did as every other compress company did, its action would constitute ordinary prudence. The assignment is without merit. The habitual practice of any number of compresses, for any period of time, can not make a negligent act an act of due care and diligence. The test is, did the compress company exercise ordinary care—that is, such care and caution in the storing or handling of cotton as a person of ordinary prudence would have exercised under the same circumstances."

The case of Lyon v. Bedgood, 54 Texas Civ. App., 19, 117 S. W., 900, is very much in point. The negligence relied on in that case was the failure to equip a turnbuckle with jam nuts at each end to prevent the turnbuckle from unscrewing and coming loose. The jam nut was a safety device very similar in its purpose to the safety device on the hook. The defendant contended that as the equipment of the defendant was similar to that in use by other companies, they were not negligent in failing to use the jam nut, but the court overruled this contention and held that the question whether or not the failure to use the jam nut was negligence upon which the plaintiff might recover, was a question of fact for the jury and not one of law for the court. In the case last mentioned, the court says:

"There was no error in refusing to give the requested instruction that, if the equipment used by defendants was such as was in general use among reasonably prudent persons engaged in the same business, defendants were in the exercise of ordinary care in using it. We do not think this is the rule in this State. Evidence of such use by other persons engaged in the same kind of business is admissible upon the issues of ordinary care, but the question is whether, under the facts of the particular case, there has been an absence of ordinary care."

It matters not, therefore, if appellee and other telegraph and telephone companies have habitually used the open hook for the purposes for which the hook here in question was used. Such habitual and continuous use will not convert negligence into ordinary care. A similar contention was likewise made in Hamilton v. Ry. Co., 36 Iowa, 31, where an employee, while attempting to couple a car,

was injured by a projecting timber. The defendant company requested the following charge:

"If the car of timber which hurt the plaintiff was loaded as loads of timber had been usually and commonly loaded and carried over defendant's and *all other railroads*, then it was not negligence in defendant to carry timber upon which the plaintiff was hurt."

In disposing of the instruction, the court says.

"The instruction was properly refused for the obvious reason that habits of negligence on the part of the defendant or other railroads will not relieve them from the consequences of their own negligent acts. If, because an act is usual and common, it ceases to be negligent, it follows that the sure way of escaping liability from injuries, in cases of this character, would be to adopt a certain and uniform system of carelessness."

In further support of the views here expressed upon the impropriety of the peremptory instruction, see also St. Louis S. W. Ry. Co. v. Neef, 138 S. W., 1168; Waters-Pierce Oil Co. v. Snell, 47 Texas Civ. App., 413, 106 S. W., 173; Missouri Pac. Ry. Co. v. Wortham, 73 Texas, 25, 10 S. W., 741; Gulf C. & S. F. Ry. Co. v. Evansich, 61 Texas, 5; Gulf, C. & S. F. Ry. Co. v. Smith, 87 Texas, 348, 28 S. W., 520; Fuchs v. City of St. Louis, 133 Mo., 168, 31 S. W., 115, 34 S. W., 508, 34 L. R. A., 118. Associate Justice McKenzie dissents and will later file opinion setting forth his views.

*Reversed and remanded.*

Opinion delivered December 4, 1913.

MR. JUSTICE GREENWOOD delivered the opinion of the court.

The question certified is: "Did the trial court err in giving the peremptory instruction?"

We answer that the trial court erred in giving the peremptory instruction for the reasons stated in the clear and correct opinion for the majority of the Court of Civil Appeals by Associate Justice Higgins, reported in 162 S. W., 406.