Ola MILNER, Appellant,

v.

HUNTSVILLE MEMORIAL HOSPITAL, Appellee.

No. 14661.

Court of Civil Appeals of Texas.

Houston.

Jan. 13, 1966.

Rehearing Denied Feb. 3, 1966.

**648**

voluntary association for the purpose of the establishment, maintenance and operation of a non-profit hospital for the people of Huntsville and Walker County. The evidence shows that such hospital is a charitable institution. Appellant has no point questioning such fact.

Under the well established law in Texas, a charitable corporation is not liable for the negligence of an employee, provided the corporation itself is not negligent in the hiring or retention of such employee. Southern Methodist University v. Clayton, 142 Tex. 179, 176 S.W.2d 749; Penaloza v. Baptist Memorial Hospital, Tex.Civ.App., 304 S.W.2d 203, writ ref., n. r. e. No contention is made in the instant case that appellee negligently hired or retained any employee.

Appellant pleaded and contends, however, that appellee acting by and through its administrator and board in the management, control and operation of said hospital, was guilty of negligent acts and omissions in failing to furnish a heating pad designed for hospital use, and in furnishing one that generated heat to the extent that it was capable of burning a patient, and also in using such heating pad without taking steps to insure that it would not generate sufficient heat to burn a patient.

W. T. Bennett, Mac L. Bennett, Jr., Huntsville, for appellant; J. Edwin Smith, Houston, on motion for rehearing.

McClain & Harrell, W. C. McClain, Cam Harrell, Conroe, for appellee; Hopkins & Alworth, Conroe, on motion for rehearing.

WERLEIN, Justice.

On rehearing our opinion handed down in this cause on November 18, 1965 is withdrawn and the following opinion is substituted therefor.

Ola Milner, who sustained a severe burn from a heating pad applied to her person in Huntsville Memorial Hospital, appeals from a summary judgment decreeing that she take nothing against appellee.

Huntsville Memorial Hospital was incorporated without capital stock, by certain citizens of Walker County, Texas, as a

The law is well settled that a charitable corporation is liable in damages for personal injuries of a patient proximately caused by the corporation's negligence in the exercise of its nondelegable duty to select and supply proper equipment for the care of patients, regardless of whether the patient is a paying patient or a beneficiary of the charity. Southern Methodist University v. Clayton, supra; Medical & Surgical Memorial Hospital v. Cauthorn, 229 S.W.2d 932, writ ref., n. r. e.; Baptist Memorial Hospital v. Marrable, 244 S.W.2d 567, writ ref., n. r. e.

We have carefully examined the pleadings, depositions and affidavits in this case in an effort to determine whether there is

any evidence raising a genuine issue of a material fact within the purview of the rule of law enunciated in the next preceding paragraph which would make the rendition of the summary judgment in question improper. "The burden of proving that there is no genuine issue of any material fact is upon the movant, and 'All doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for a summary judgment.'" Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929.

The evidence shows that appellant was admitted to the hospital as a paying patient in the late afternoon of April 4, 1963, for the treatment of a low back and head injury caused by a fall. She was given a shot of some sort to relieve pain and shock before entering the hospital, and after admittance received one or more shots and other medication for the purpose of enabling her to rest. She was in a state of semi-consciousness throughout the evening and night of April 4, 1963, and the early morning of the following day. During such period, a heating pad was applied to her back by a hospital nurse or aid. The heating pad in question had a manual control with three buttons marked to indicate high, medium and low heat. Sometime between the hours of 10 o'clock in the evening of April 4 and 5 or 6 o'clock of the morning of April 5, appellant sustained severe burns on her right hip and thigh, which were caused by the heating pad.

Appellant in her affidavit stated that she recalled a girl bringing the heating pad and placing the same under her, but her memory was quite vague because she was under such heavy sedation that she didn't really know what was going on and could not relate what happened with certainty. She could not describe the heating pad or the kind of controls that were on the same. She further stated that she was familiar with various types of heating pads, and had supervised their use on many occasions when working as a practical nurse; that if she touched the controls of the heating pad that

was applied to her back she had no knowledge thereof; that because of her condition she didn't know what went on during the night nor what she may have done or not done; that she knew from her experience as a practical nurse that it takes an hour or more for any ordinary heating pad sold at drug stores to inflict burns such as she sustained during the night, and that the pad would have to be on high heat; that if a heating pad such as sold in drug stores is turned on high heat, and is wrapped with a heavy towel or thick cloth it will not generate enough heat to inflict burns to the human body.

She also stated in her affidavit that a push-button type heating pad may be secured in a low heat position by pushing the low button down and placing a small wooden or metal object over the button in its down position and then taping the same with adhesive tape customarily used in hospitals, and that so secured it would not inflict a burn upon the human body, even if the pad is not covered with anything. She further stated that she knew the type of heating pad which was introduced in evidence on the taking of the deposition of Mr. Goodrum, the administrator of the hospital, and that if it were secured at low heat position in the manner she described, then one could not push down the high or medium heat button and engage the same. She also stated that from her experience as a practical nurse she knew that heating pads are made and regularly offered for sale that will not generate sufficient heat to burn a person, and that such pads are ordinarily called Hospital Pads, because designed for hospital use, and they are regularly used in the cities in the Gulf Coast area; that one type of these pads known as the "Casco" pad is offered for sale by hospital supply companies and has been for several years prior to the time she received her burns on April 4, 1963; that information in regard to such heating pads had been available for some years prior to such date upon the slightest inquiry being made; that if one of such pads had been applied to her

back or body she would not have sustained a burn; that she could not state the condition of the heating pad by which she was burned, the degree of heat that was being applied, nor how long the pad remained on her body because she was just knocked out from shock, medication and sedation; and that if she changed the button position of the heating paid she was not conscious of such act because of her condition. She said she did know what could happen to a person being treated with a heating pad on high heat that is wrapped only with a thin flannel cloth which comes with the pad, as was the pad in question.

Plaintiff's Exhibit No. 5 is a Casco pad that has on it control buttons designated "Hi", "Med" and "Lo", and an "Off". It is called a "multi-heat genuine wet proof automatic electric heating pad, 55 Watt, 115 volts" with caution on it to use no pins. It appears to have been manufactured in Bridgeport, Conn. The evidence shows it was the type of pad used at the time appellant sustained her burns. The hospital records showed that at one time during the night redness was noted on appellant's back and the notation was made "Patient reinstructed to keep heat pad on low," which entry was made by the registered nurse, Mrs. Holt, who was on duty from 3 o'clock to 11 o'clock at night on April 4.

Mr. Goodrum, in his first deposition, testified that he could not identify the particular heating pad that was used; that the heating pads were bought upon his authorization by the director of nurses; that he did not give instructions to buy any particular kind or brand of heating pad—"only to buy those that we felt was competent to use in a hospital"; that he did not have occasion to see heating pads or have heating pads shown to him, or to have someone try to sell him heating pads that had controls fixed in such a manner that they locked in place, and that he had made no inquiries to determine whether or not that type of heating pad had been purchased; that the patients were instructed to keep their heating pads on low heat; that he knew when a patient is highly sedated they don't know half the time what they are doing; that he did not know from being around hospitals that the part of the control above low heat could be taken out of a heating pad so that it would just burn on low heat, and that this was his first experience in the last eleven years to know of a patient being burned with a heating pad.

In his second deposition, which was taken on April 22, 1965, Mr. Goodrum testified in substance that they ordered their heating pads from McKesson & Robbins Company out of Houston, which is a wholesale supply company, and that they checked all of their heating pads and found them to be in good working order; that such pads were used and used safely and as far as he knew, such pads were equal to other like or similar pads used by hospitals; that he had made an investigation of certain Houston hospitals, and found that they were using an "Aqua" pad called a "K" pad that has a little motor deal that runs water through little pipes inside a pad at a preset temperature, and that the patient could not change the setting because it is locked, but that he did not know that such pads were used in all major hospitals in Houston; that in making the inquiry as suggested by appellant's counsel he could not say whether such hospitals had been following such procedure for a period of some two or three years, but that they were using them at the time he asked advice on what they were using; that such pads are very expensive and that they were checking to find out if they were satisfactory and worth their value; and that he found that such hospitals continued to use them and that the Huntsville hospital uses them now. An objection was made to such testimony in regard to any change made subsequent to the date of the accident to appellant because the record does not show that the change was made because of any safety measure. Mr. Goodrum further testified that he made the inquiry mostly on the advice of appellant's counsel who questioned him about it at the time his previous deposition was taken.

Mrs. R. Yeager, who had worked as a registered nurse for a number of years and in several different hospitals, testified that appellant's burn was on the outside of her right hip and thigh; that she had attended appellant the early part of the night and at that time the heating pad was on the lower part of appellant's back; that she was in to see the patient at 4 o'clock in the morning and found that she was on her right side and the heating pad was under her right hip, on low; and that appellant when asked in the morning who turned the heating pad on high, said she didn't know unless she did it in her sleep.

Mrs. Yeager further testified that the heating pad in question was fairly new and was not defective. It was the type of pad used in various places where she had worked, and that until the past year she had never used any other type of heating pad; that it was as good a heating pad as she had ever seen used, and was the same or similar to the ones she had seen used; that it could be purchased at drug stores and even in grocery stores, and at most any store that furnishes medical supplies, and, based on her experience, she thought most homes had them; that she did not believe they had had any other patient burned during the time she had been working at the hospital; and that it had not been her experience in any of the hospitals where she had worked, that the portion of the heating pad that moved the heat up to medium and high was removed by a mechanic or electrician. She also testified that about a year ago they started using in the hospital a new type of heating pad containing a water system, which they called a "Thermo" pad.

■ It is our view that the evidence raises genuine issues of material fact with respect to negligence on the part of appellee's employees responsible for the manner in which the heating pad was applied and used on the occasion in question, and whose duty it was to care for and tend appellee's patients. Since, however, there is no evidence that appellee was negligent in employing and retaining any of its employees, the negligence of its nurses and nurses' aids in failing to use the heating pad in a proper manner would not establish liability on the part of appellee.

The evidence shows that although the heating pad in question was not defective, it would, when turned on high heat and applied for as long as an hour, burn a patient; that such heating pad was furnished by the hospital for use on all patients, including those who might be under heavy sedation or unconscious or sleeping; that such heating pad when applied to a patient under heavy sedation or unconscious might seriously burn such patient as was done in the instant case; that at the time appellant sustained her injury, there were commonly used in Houston hospitals and hospitals in the Gulf coast area heating pads which would not burn a patient under any circumstances and that such heating pads were readily available on the market. There is no evidence that the hospital administration in furnishing for use the pad in question issued any instructions with respect to securely wrapping the same with a towel or other heavy cloth or securing the same in such way that the heating pad could not be turned on high heat when it was used on patients under heavy sedation or who were unconscious or sleeping. As to a hospital's non-delegable duty to instruct employees, see Hotel Dieu v. Armendarez, Tex.Com. App.1919, 210 S.W. 518.

■ The question narrows down to whether a genuine issue of material fact was raised by appellant of negligence on the part of appellee in supplying for use by its personnel the type of heating pad used on the occasion and under the circumstances in question when there were at such time heating pads which could have been purchased, and which were used at some Houston hospitals and hospitals in the Gulf coast area, that were so constructed that they would not burn a patient under any circumstances. The evidence does not show who was responsible for turning the heating

pad in question on high heat. It could have been the involuntary act of an unconscious or sleeping person or the negligent act of an employee. Regardless of this, it seems clear that the hospital had furnished for use on all patients a heating pad that was not reasonably safe when applied to an unconscious person or one under heavy sedation, without some prior affirmative action having been taken to cover or secure the pad in a manner ·that it could not burn such patient. It is our view that appellant raised a genuine issue of material fact as to negligence on the part of the hospital administration in furnishing such heating pad under the circumstances of this case when there were available on the market heating pads that were safe and would not burn a patient under any circumstances.

The fact that heating pads such as the one in question were used in some other hospitals and were generally recognized as standard equipment tends to show that the hospital performed its duty of care, but it is not conclusive as a matter of law. As stated in 38 Tex.Jur.2d, p. 241, Master and Servant, Sec. 71; "That is to say, even if the evidence is uncontradicted that a similar appliance is in general use, there is still an issue for the jury as to whether in the furnishing of the appliance, the inefficiency of which was the cause of the injury, the employer exercised reasonable care."

In French v. Southwestern Telegraph & Telephone Co., Tex.Civ.App., 162 S.W. 406, the court said:

"The question is: Was the use of the open hook such care and caution as an ordinarily prudent person would have used under the same circumstances? The fact that appellee and other companies had habitually and customarily used the same does not, of itself, show that they had exercised ordinary care."

The Supreme Court answered the certified question of the Court of Civil Appeals in said case, approving its holding. 110 Tex. 505, 221 S.W. 570. See also Cameron Compress Co. v. Whitington (Tex.Com.

App.), 280 S.W. 527, in which the court held in substance that the habitual and customary use of a particular device will not · of itself establish ordinary care although evidence of custom is admissible on the issue of negligence. See El Paso Electric Co. v. Gregston, Tex.Civ.App., 170 S.W.2d 515; Thompson v. Graham, Tex.Civ.App., 333 S.W.2d 663, writ. ref., n. r. e.; Wichita Valley Ry. Co. v. Durrett, Tex.Civ.App., 174 S.W.2d 329, writ. ref.; St. Louis Southwestern Ry. Co. of Texas v. Johnson, Tex. Com.App., 268 S.W. 926; Comanche Duke Oil Co. v. Texas Pac. Coal & Oil Co., Tex. Com.App., 298 S.W. 554. See also Brown v. Lundell, 1961, 162 Tex. 84, 344 S.W.2d 863, in which the Supreme Court said:

"The ultimate issue was whether Brown was negligent in the way and manner in which he disposed of the salt water, while the questions as to what was the custom, whether Brown had complied therewith and whether the custom itself was negligent, are only evidentiary as to the negligence of the operator."

The heating pad furnished by the hospital administration, although theretofore used by the hospital and by persons not in hospitals, was not the only heating pad available on the market. A safe type was readily available, and was used by some other hospitals, and could also be classified as standard equipment. Since the two kinds of pads were available, and one being safer than the other, it is for the jury to determine whether or not under the facts and circumstances of this case, the hospital should have furnished and used the safer ·appliance, which would not have burned appellant.

▬ In resolving all doubts as to the existence of a genuine issue of a material fact against the party moving for summary judgment, as we are required to do, we are of the opinion that the present record does not disclose a case for summary judgment. In view of our holding, it will not be necessary to consider appellant's last point, in which she contends that appellee is not im-

mune from liability for damages resulting from the negligence of its servants and employees because it had obtained a liability insurance policy covering such negligent acts and omissions. We merely call attention to the opinion of the Supreme Court in the case of Watkins v. Southcrest Baptist Church, handed down January 5, 1966, 399 S.W.2d 530, in which the Court held to the contrary of such contention.

Reversed and remanded.