**UNIROYAL GOODRICH TIRE COMPANY, Appellant,**

v.

**Roberto O. MARTINEZ and Juanita Martinez, Individually and As Next Friends of Robert Martinez, Jr. and John Mathew Martinez, Minors, and Mary Willis, Appellees.**

No. 04–93–00526–CV.

Court of Appeals of Texas, San Antonio.

Oct. 4, 1995.

Rehearing Overruled Nov. 1, 1995.

John B. Kyle, Dena L. Mathis, Jackson & Walker, L.L.P., Dallas, for Appellant.

Steve T. Hastings, Rose Rivera Vela, Allison & Huerta, Corpus Christi, for Appellee.

Before RICKHOFF, LOPEZ and GREEN, JJ.

## OPINION

LOPEZ, Justice.

Uniroyal Goodrich Tire Company (Goodrich) appeals a jury verdict for Roberto Martinez (Martinez) and his wife, Juanita Martinez, individually and as next friends of Robert, Jr. and John Martinez. We affirm in part and reverse in part.

Martinez suffered severe injuries on October 31, 1990 when he was struck by a 16″ Goodrich tire that exploded after he had mounted it on a 16.5″ rim during the course of his employment. Martinez brought suit against Goodrich as manufacturer of the tire, The Budd Company (Budd), manufacturer of the rim, and Ford Motor Company (Ford), who designed the specifications for the rim. Three theories were alleged in Martinez's petition: (1) strict products liability based on defective design, (2) negligence, and (3) gross negligence. Budd and Ford settled prior to trial. The jury found that (1) the design defect in the Goodrich tire was a producing cause of Martinez's injuries; (2) the rim was not defective as designed by either Ford or Budd; (3) Goodrich's negligence and gross negligence proximately caused Martinez's injuries; and (4) neither Martinez, Budd, nor Ford was negligent. The jury awarded Martinez and his family $5.5 million in actual damages plus $11.5 million in punitive damages. The punitive damages were reduced to one times the actual damages pursuant to a pretrial agreement between the parties. The trial court further reduced the total damages by $1.4 million in accordance with Goodrich's elected dollar for dollar settlement credit. The court also awarded prejudgment interest. Goodrich brings twenty-one points of error on appeal.

■ Several of Appellant's points of error challenge both the legal and factual sufficiency of the evidence. In considering a "no evidence" or legal sufficiency point of error, we consider only the evidence favorable to the verdict and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988). When more than a scintilla of evidence supports the jury's finding, we are not at liberty to sustain a no evidence point. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). When considering a factual sufficiency point, however, we review all of the evidence and sustain the point of error only if the supporting evidence is so weak as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

## 1. Negligence

■ In its first point of error, Appellant contends that there was no evidence or insufficient evidence that Goodrich was negligent. Negligence consists of three essential elements: (1) a legal duty owed by one person to another; (2) breach of that duty; and (3) damages proximately resulting from that breach. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987). A manufacturer has a duty to exercise reasonable care in designing and manufacturing a product. *Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867, 871–72 (Tex.1978). To show that conduct caused an injury, the plaintiff must present evidence of cause in fact and foreseeability. *El Chico Corp.*, 732 S.W.2d at 313.

■ On the issue of a duty, Mr. Milner, a metallurgical engineer, testified that Goodrich was unreasonable in not designing the tire to be more resistant to breaks. He noted that a stronger and more uniform bead had been available since the early 1970s. Mr. Milner also explained how the breaks occur in the multi-strand bead tire, the type involved in this case. Testimony of Mr. Milner indicated that the tire industry was well aware of the tire failure problems due to mismatching, when a 16″ tire was mounted on a 16.5″ rim, since at least the early 1970s. Frank Timmons, a representative for the Rubber Manufacturer's Association, testified about a presentation he made in Japan regarding the history of and problems with the 16.5″ wheel systems. Goodrich's prior Di-

rector of Industry Standards and Government Relations was in attendance at the meeting to help urge the Japanese manufacturers not to introduce a 15.5″ wheel system into the United States market because of the mismatching problems encountered with the 16.5″ wheels.

Stanley Lew, a tire engineer for Goodrich for twenty years, testified that the single strand bead, advocated by Mr. Milner, was not foolproof and would still be dangerous if the mismatched tire and rim were used on the road. Mr. Lew did agree, however, that the single strand bead had some advantages. Goodrich bought a new machine in 1990 to convert to the single strand bead in 1991.

In considering the causation issue, our review of the record revealed that several witnesses, including Goodrich's experts, testified that if the tire had been made with the stronger, single strand bead, the explosion may not have occurred under the air pressure being used at the time of the accident. There was conflicting evidence, however, on what pressure was in the tire at the time of the explosion.

Ray Regalado, an employee working with Martinez on the day of the accident, verified that the exploding tire was the cause of a serious head injury to Martinez. Testimony from several doctors and Martinez's family confirmed the damages incurred by Appellee from the injury.

In reviewing the above evidence, the fact that the use of an alternative design may have prevented the accident was sufficient to indicate a lack of reasonableness by Goodrich. There is also sufficient evidence to establish that the weak tire bead was the cause of the explosion and the resulting injury and damages. We hold, therefore, that the evidence is adequate to support the jury's finding of negligence, both legally and factually. Point of error one is overruled.

## 2. Design Defect

Appellant asserts, in its second point of error that there was either no evidence or insufficient evidence to support the jury's finding that the tire was defectively designed and that such design was a producing cause of Appellee's injuries.

Texas has recognized a strict liability cause of action for defective products, as set out in the Restatement Second of Torts § 402A, since 1967. *McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787, 789 (Tex. 1967). The elements of proof for a defective product cause of action include:

(a) The product must be defective;

(b) The product must reach the consumer without substantial change from the time it leaves the possession and control of the manufacturer or seller;

(c) The defective condition of the product must render the product unreasonably dangerous;

(d) The unreasonably dangerous condition of the product must be the cause of the injury to the user.

RESTATEMENT (SECOND) OF TORTS § 402A (1965). A product defect can be shown by either a manufacturing defect, a design defect, or a marketing defect. *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.,* 848 S.W.2d 724, 732 (Tex.App.—Dallas 1992, writ denied). Appellant contends, in its brief, that Plaintiff's failure to obtain a finding that the warning was inadequate precludes recovery under a defective design theory.[1] When an issue of defective design is alleged, however, the presence of a warning label is only one of many factors to be considered in determining the utility of a product. *Temple EasTex,* 848 S.W.2d at 724. The pleadings in this case alleged defective design, therefore a finding of the adequacy of the warning label was not required.

A product is defectively designed when it is unreasonably dangerous, taking

---

1. Appellant, however, cites only to cases involving an issue of marketing defect. *See Magro v. Ragsdale Bros.,* 721 S.W.2d 832, 834 (Tex.1986); *Technical Chem. Co. v. Jacobs,* 480 S.W.2d 602, 603 (Tex.1972); *Blackwell Burner Co. v. Cerda,* 644 S.W.2d 512, 516 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.); *Horak v. Pullman, Inc.,* 764 F.2d 1092, 1095 (5th Cir.1985); *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1275 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Carter v. Johns–Manville Sales Corp.,* 557 F.Supp. 1317, 1320 (E.D.Tex. 1983).

into consideration the utility of the product and the risk involved in its use. *Turner v. General Motors Corp.,* 584 S.W.2d 844, 847 n. 1 (Tex.1979); *see also Acord v. General Motors Corp.,* 669 S.W.2d 111, 115–16 (Tex. 1984). In a defective design case, both parties are to present evidence regarding several factors to consider in order to provide the trier of fact with appropriate balancing criteria. *Turner,* 584 S.W.2d at 849. Factors to consider that indicate a design defect include: (1) the availability of safer design alternatives, *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 746 (Tex.1980); (2) proof of similar accidents involving that same product, *Magic Chef, Inc. v. Sibley,* 546 S.W.2d 851, 855 (Tex.Civ.App.—San Antonio 1968, writ ref'd n.r.e.); (3) subsequent changes or modifications in design, Tex.R.Civ.Evid. 407(a); (4) evidence of out-of-court experiments, *F.M.C. Corp. v. Burns,* 444 S.W.2d 315, 322 (Tex.Civ.App.—San Antonio 1969, no writ), and (5) expert testimony claiming a design defect Tex.R.Civ.Evid. 702, 703, 704; *General Electric Co. v. Schmal,* 623 S.W.2d 482, 484–85 (Tex.App.—Texarkana 1981, writ ref'd n.r.e.). *See Turner,* 584 S.W.2d at 849.

■ Our review of the evidence in favor of the jury's finding of a defective design shows that there is legally sufficient evidence to support the finding. Mr. Milner testified for Appellee that an alternative design with a stronger bead had been available since at least 1972. Testimony was also given verifying Goodrich's answer to interrogatories admitting to thirty-four known lawsuits involving the same product. Mr. Milner also testified that other tire manufacturers had switched to the stronger, single strand bead much sooner than Goodrich, who changed their design in 1991. Documentary evidence was introduced showing an experiment conducted by Goodrich in 1976 with mismatched 16.0″ tires on 16.5″ rims. This document verified that the tires could explode at 73 pounds per square inch of air pressure (P.S.I.). Mr. Milner clearly stated that he thought the Goodrich tire involved in the injury was defectively designed.

Further evidence was presented by both parties regarding Goodrich's design of the tire. Goodrich's design change was verified by Mr. Lew, who also testified that Goodrich had gone to a higher tensile wire in 1987. Mr. Lew contended that the current, technologically advanced machine for single strand was not available until 1986 for testing. He also claimed that the single strand design change was made to provide a smoother ride with a more uniform tire. Mr. Lew stated that only one lawsuit had been filed since the warning label was placed on the tires, and in the lawsuit the customer had ordered a 16.5″ tire and the mounter had improperly tried to mount a 16″ tire.

Tom Conner, a forensic scientist, testified that it is not possible to get a complete bead seating when a 16″ tire is put on a 16.5″ rim. Mr. Conner also stated that there is a high risk of blowout on the road if the mismatch goes unnoticed. He discussed recent tests done by the major tire manufacturers where the tires did not fail until between 90 and 130 P.S.I.

Donald Avila, a tire engineer who worked for Goodyear Tire and Rubber Company for twenty years, testified that there is not an adequate solution available to avoid the mismatching explosions.

After reviewing all evidence presented by both parties on whether Goodrich's tire was defectively designed, we conclude that the jury's finding was not unjust. Evidence pointing to safer alternatives, similar accidents, and subsequent changes supports the jury's decision. *See Turner,* 584 S.W.2d at 849. Appellant's second point of error is overruled.

### 3. Gross Negligence

■ Appellant's third point of error challenges the legal and factual sufficiency of the evidence supporting the jury's finding that Goodrich was grossly negligent. The supreme court recently delineated the standard of review to be applied to gross negligence cases in *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex.1994). Because the appeal in this case was pending when the *Moriel* decision was handed down, we will apply *Moriel. See Ellis County State Bank v. Keever,* 888 S.W.2d 790, 799 (Tex.

1994). To establish gross negligence, the plaintiff must show, by a preponderance of the evidence, that:

(1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and

(2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, welfare and safety of others.

*Moriel,* 879 S.W.2d at 23; *see also* TEX.CIV. PRAC. & REM.CODE § 41.001(5) (Vernon Supp. 1995). "Extreme risk" is a function of both the magnitude and probability of harm to the plaintiff. *Moriel,* 879 S.W.2d at 22; *Caterpillar, Inc. v. Shears,* 881 S.W.2d 923, 932 (Tex.App.—Corpus Christi 1994), *rev'd on other grounds,* 911 S.W.2d 379 (1995). The extreme risk prong is only satisfied by evidence showing " 'the likelihood of serious injury' to the plaintiff." *Moriel,* 879 S.W.2d at 22 (quoting *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 327 (Tex.1993)). The remote possibility of injury is not enough. *Moriel,* 879 S.W.2d at 21. An act or omission that is merely thoughtless or careless is not enough, the actor must proceed with actual *conscious indifference to the risk. Id.* at 20. The subjective conscious indifference is what distinguishes gross negligence from ordinary negligence. *Alexander,* 868 S.W.2d at 325. The defendant's subjective mental state may be proven by direct or circumstantial evidence. *Moriel,* 879 S.W.2d at 23.

In reviewing the record for evidence of gross negligence, we consider all of the previously summarized evidence and would supplement the following: Mr. Milner, in testifying for Martinez, advocated that to increase safety the wire bead should be 50 thousandths tensile strength. Mr. Lew contradicted Mr. Milner's testimony by asserting that Goodrich had indeed changed to the stronger bead wire in 1987. Mr. Lew also described the one lawsuit since the pictorial warnings, emphasizing the mismatch hazard, had been placed on the 16″ tires. The lawsuit involved a customer who requested a 16.5″ tire and the mounter tried four times to get a 16″ tire to seat correctly. Mr. Lew

indicated that the mistake was made by the tire mounter. He also testified that there were drawbacks to the single strand bead and that Goodrich had waited until 1986, when a more technologically perfected machine was available, to begin testing for use of a single strand bead wire.

As previously noted, several witnesses testified that Goodrich was involved in trying to convince the Japanese manufacturers not to introduce a 15.5″ tire because of the problems experienced with the 16.5″ tire system. The evidence was conflicting on whether there was a "better" solution in designing tires so that they would not explode in a mismatch situation. Although Mr. Milner contended that a stronger, single strand bead was the solution, he also admitted that if the rim had been designed so it was easily distinguishable or would not accept the wrong size tire, no accident would have occurred. Mr. Lew, Mr. Avila, and Mr. Conner all testified that a tire with a stronger bead or single strand bead will still explode, depending on the air pressure in the tire.

Various tests involving tires designed by the major manufacturers were introduced by both parties. These tests indicated that the lowest pressure range involving an explosion could occur over 73 P.S.I. (testing done by Goodrich on tires with the lower tensile strength bead in 1976), while most occurred at between 90 and 130 P.S.I. (current tires with the stronger bead). Mr. Milner and Mr. Regalado estimated the tire pressure at the time of the accident to be about 50 P.S.I. The normal pressure for the tire involved in the accident was 60 P.S.I. All of the experts agreed that it was unsafe to apply more than 40 P.S.I. when trying to seat the tire properly.

Although there is sufficient evidence to establish that an extreme risk was involved, the evidence of probability that harm would occur under normal circumstances is insufficient. Under normal pressure levels, the chances of an explosion was shown to be nonexistent by all test results introduced. Furthermore, only one suit involving a mismatched tire had been filed involving Goodrich since the warnings had been placed on the tires and the circumstances of that case

indicated that the culpability fell strongly on the party mounting the tire.

The most questionable issue on gross negligence in this case, however, is whether Goodrich acted with conscious indifference. The evidence showed that Goodrich had clearly warned against the dangers of mismatch. When a manufacturer places a warning on a product, to protect against misuse, he can expect that the warning will be followed. RESTATEMENT OF TORTS (SECOND) § 402A cmt.i (1977). The testimony that Goodrich was involved in talks with the Japanese to discourage the introduction of another tire system with potential for mismatch problems, further indicated Goodrich's concern. The evidence also showed that although alternatives were available, there was not a fail-safe solution, that could be achieved by the tire manufacturers, to prevent a mismatch explosion. The only evidence introduced that Goodrich was consciously indifferent to the possible harm resulting from a mismatch was the opinion testimony of Mr. Milner. All other evidence refutes that Goodrich disregarded the mismatch problems.

We find that the jury's decision on gross negligence is not supported by the bulk of the evidence and is unjust when reviewing all of the evidence presented. We affirm Appellant's third point of error.

### 4. Exemplary Damages

Appellant further challenges, in points of error four through seven, the trial court's rendering of the judgment to include exemplary damages based on the jury's verdict. An award of exemplary damages must be supported by a culpability finding of at least gross negligence. *See Moriel,* 879 S.W.2d at 16, 19. Because we do not find evidence to support the jury's decision on gross negligence, the award of exemplary damages cannot be upheld and we will not address points of error four through seven.

In point of error eight, Goodrich challenges the amount of exemplary damages, claiming that it should have been lowered to $4.1 million per a pre-trial agreement. Again, because of the unsupported finding on gross negligence, this point of error is now moot.

### 5. Contributory Negligence

In points of error nine through fourteen, Appellant asserts that there was either no evidence or insufficient evidence to support the jury's findings of no negligence or causation that contributed to Appellee's injuries by Budd, Ford, or Martinez.

We will first review the evidence presented on the negligence of Budd and Ford in designing and manufacturing the rim. Mr. Milner, testifying for Appellee, stated that the tire manufacturers were aware that many of the 16.5″ rims were still in use, even though Budd stopped manufacturing them in 1983. Mr. Milner offered his opinion that the rim was defective because the size was not clearly and conspicuously marked. He further stated that the condition of the rim was one cause of the accident. Mr. Martinez testified that the size of the rim should be placed near the valve system so it was easier to identify.

Mr. Conner, testifying for Appellant, suggested that the rim could be manufactured with a safety hump (as the Japanese had done) so that an improper tire could not be mounted. Mr. Conner also emphasized the need to have the rim size clearly marked near the valve for easy identification. Donald Scriver, a retired engineer for Budd, testified that it was feasible to put a more conspicuous marking near the valve. Mr. Lew testified that Budd had been involved in 132 lawsuits regarding the rim type involved in this case. Mr. Lew also described how the Japanese had designed their rim to reject a mismatched tire and had placed clear labels stating the size on each rim. Mr. Lew did concede, however, that the only thing that failed in this accident was the tire.

Although Appellant asserts that the evidence of Budd and Ford's negligence was uncontroverted, Appellant's own witness agreed that the tire was the only product that "failed." The evidence showed that Budd had stopped manufacturing the rim, and therefore could not redesign it; while Goodrich was in a position to design their

tires to lower the chance of mismatch accidents. We find that this evidence was legally and factually sufficient to support the jury's finding that Goodrich was 100% at fault.

■ Appellant also asserts that Martinez was contributorily negligent in changing the tire. Mr. Milner testified that a special gauge is required to measure the size of a tire rim and that no tire shops would have the gauge. He also stated that there is no way to tell, without trying to decipher the small coded numbers and letters on the rim, what size a rim is.

Mr. Vera, Martinez's employer at the time of the accident, testified that it is very difficult to tell the size of a rim. Mr. Regalado, who was working with Martinez when the accident occurred, described how he had taken six 16″ tires off the truck and already mounted 16″ tires on five of the rims with no problems. He also testified that the tire they took off of the last rim was a 16″ tire. Martinez corroborated that the tire being replaced was a 16″ tire and that he was following the same procedures he had followed many times in changing tires.

Mr. Conner emphasized in his testimony that a person should always check the markings on the rim to make sure there is a proper match. He conceded, however, that it is often difficult to determine the size of the rim.

Appellant also asserts that Martinez was negligent in putting excessive air pressure into the tire. Mr. Regalado testified that the pressure in the tire at the time of the accident was about 50 P.S.I.; Martinez was filling the tire to the required 60 P.S.I. after they heard it "seat" at about 38 P.S.I. Mr. Milner verified that in his opinion, considering the condition the tire was in after the accident, the pressure in the tire was about 50 P.S.I. when it exploded. Mr. Avila testified, however, that the pressure had to have been at over 100 P.S.I. when it exploded because of the markings on the tire and the fact that the valve was broken.

In sum, the evidence indicates the difficulty in identifying the rim size, the fact that a 16″ tire was taken off the rim involved in the accident, and that it appears Martinez was following the usual procedure when changing the tire. We find that there was sufficient evidence, both legally and factually, for the jury to determine that no part of the accident was attributable to Martinez's negligence.

Points of error nine through fourteen involving the contributory negligence of Budd, Ford and Martinez are overruled.

■ Appellant further asserts, in point of error fifteen, that there is no evidence, or alternatively, insufficient evidence for the jury's finding that Martinez did not contribute to the injury by failing to pursue rehabilitation.

Dr. Rossi, a neurologist who treated Martinez for three months in rehabilitation, testified that Martinez did not comprehend the extent of his injury or the need for further rehabilitation. Dr. Rossi attributed the lack of comprehension directly to the injury from the tire accident.

Donna Johnson, a vocational rehabilitation counselor, testified that further rehabilitation would be beneficial for Martinez. Martinez's wife testified that the family was willing to encourage further treatment, but she was unsure that her husband would cooperate. Martinez testified that he would not go through further rehabilitation unless his family could be close by; he later testified that he would not enter rehabilitation again unless his wife threatened to leave him.

Dr. Seaton, a neuropsychiatrist who treated Martinez at the Tangrum Rehabilitation Center, testified that Martinez was a good candidate to successfully complete the rehabilitation program. He also testified that patients with conditions similar to Martinez could eventually become employed. Dr. Seaton agreed that Martinez's denial of a need for rehabilitation could be attributed to the brain injury he incurred.

Although the evidence was clear that Martinez did not follow through on rehabilitation, his perception of the need for further treatment was identified as a condition of his injury. We find, therefore, that the evidence was legally and factually sufficient to support the jury's finding that Martinez did not contribute to the injury by failing to pursue

rehabilitation. Point of error fifteen is overruled.

### 6. Evidence

In points of error sixteen, seventeen, and eighteen, Appellant asserts that the trial court erred in admitting evidence of other lawsuits against Goodrich, subsequent design changes, and "the Milner timeline."

■ It is within the trial court's wide discretion to determine the admissibility of evidence. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). A judgment will not be reversed based on improper admission of evidence unless the error "was reasonably calculated to cause and probably did cause rendition of an improper judgment . . ." TEX.R.APP.P. 81(b).

■ Evidence of other lawsuits or claims is admissible if the events occurred under "reasonably similar but not necessarily identical circumstances." *Missouri–Kan.-Tex. R.R. Co. v. May,* 600 S.W.2d 755, 756 (Tex.1980); *see also Magic Chef, Inc. v. Sibley,* 546 S.W.2d 851, 855 (Tex.Civ.App.—San Antonio 1977, writ ref'd n.r.e.). Goodrich contends that Martinez offered no predicate indicating that the circumstances were similar in the other suits. The evidence of previous lawsuits was obtained through interrogatories in which Goodrich was asked to identify suits involving accidents resulting from a 16″ Goodrich tire being mounted on a 16.5″ rim. Goodrich was allowed to present, through the testimony of Mr. Lew, evidence that qualified the circumstances under which the lawsuits had been filed. We find that the size and mismatch problem, each resulting in an accident involving a Goodrich tire, indicate adequate similarity to negate a finding that the trial court abused its discretion in admitting the evidence of other lawsuits.

■ Subsequent design changes in a products liability case are specifically allowed under TEX.R.CIV.EVID. 407; *Chapa v. Garcia,* 848 S.W.2d 667, 671–72 n. 6 (Tex.1992). Furthermore, although Appellant argues that the design change was made to the light truck radial tires and not the light truck bias-ply tires involved in this case, we find nothing in the record that indicates this argument was presented to the trial court. Appellant had a running objection to the relevancy of design changes made to a "space saver" tire, but in subsequent testimony by Mr. Milner, Appellant did not object to the introduction of design changes incorporating the single strand bead into light truck tires. This issue was not properly preserved for review. TEX. R.APP.P. 52(a).

■ In requesting that the timeline, prepared by Mr. Milner, be admitted into evidence, Appellee pointed out that each of the notations on the timeline was already in evidence through testimony of Mr. Milner. A chart summarizing previous testimony is rarely a source of reversible error. *See Southwestern Bell Tel. Co. v. Vollmer,* 805 S.W.2d 825, 832 (Tex.App.—Corpus Christi 1991, writ denied); *Houston Lighting & Power Co. v. Klein Indep. Sch. Dist.,* 739 S.W.2d 508, 519 (Tex.App.—Houston [14th Dist.] 1987, writ denied). Appellee introduced the timeline on the premise that it was prepared by Mr. Milner to clarify the sequence of events regarding the history of the mismatch problems in the tire industry. Trial courts have discretion, in order to aid the jury's understanding, to allow charts that summarize or even emphasize the testimony of a witness. *Speier v. Webster College,* 616 S.W.2d 617, 618–19 (Tex.1981). We find, therefore, that the trial court did not abuse its discretion in admitting the timeline that outlined Mr. Milner's testimony.

Because we find that the trial court did not abuse its discretion in admitting the above described evidence, there was no reversible error and points of error sixteen, seventeen, and eighteen are overruled.

### 7. Damages

■ Appellant urges, in points of error nineteen, twenty, and twenty-one, that there is factually insufficient evidence to support awards of $3 million in actual damages to Martinez, $500,000 to Juanita Martinez, and $1 million to each of Martinez's sons. In determining whether damages are excessive, we apply the same standard as for any factual sufficiency question. *Pope v. Moore,* 711 S.W.2d 622, 624 (Tex.1986).

■ Everett Dillman, an economic consultant, testified regarding Martinez's economic losses. The range of lost wages was from $301,707 making $6 per hour until age sixty with no wage increases, to $725,000 for the average wage of a truck driver until age seventy. Mr. Dillman also calculated the cost at $5.3 million if Martinez were to require full time care for the remainder of his life. Mr. Dillman noted that these figures do not include any amounts for pain and suffering, disfigurement, or mental anguish. The actual medical bills amounted to $183,000.

Dr. Rossi testified that Martinez would not be able to live independently if his mother and wife were unable to care for him. He also testified that Martinez was not employable. Ms. Johnson agreed that Martinez was not employable in his current condition. Mrs. Martinez indicated that she was unsure of her future with her husband because of his hostile and violent behavior toward her and their sons.

As noted above, Dr. Seaton did testify that he evaluated Martinez as a good candidate for rehabilitation, but that Martinez did not agree with the need for further treatment. Dr. Seaton recognized that Martinez's failure to cooperate was a possible result of the brain injury.

From the above evidence the jury could have tabulated an amount for Martinez including previous medical expenses, lost wages, and future care in excess of the amount awarded. In reviewing the evidence presented on damages for Martinez, we find that there was factually sufficient evidence to support the award.

■ Appellant further challenges the award of $500,000 to Mrs. Martinez. Loss of spousal consortium is recognized in Texas to include "the mutual right of husband and wife to that affection, solace, comfort, companionship, society, assistance and sexual relations necessary to a successful marriage." *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 328 (Tex.1993) (quoting *Whittlesey v. Miller,* 572 S.W.2d 665, 666 (Tex. 1978)).

■ Mrs. Martinez testified that her husband was unable to help her with chores around the house and that he no longer fixed the family car or repaired broken appliances, as he had always done in the past. She testified that she needed to be very careful around Martinez, in order to avoid making him angry and violent. Mrs. Martinez described instances when her husband had threatened her and physically assaulted her, something he had never done prior to the accident. Mrs. Martinez testified that Martinez had become very jealous and possessive, often accusing her of spending time with other men. Dr. Rossi testified that it was very difficult for Mrs. Martinez to live with and care for her husband in his current condition and that the anger, jealousy, and paranoia was consistent with head injury cases. Mary Willis, Martinez's mother, also testified regarding the change in her son and that he had been a good provider, a good husband and father, and how difficult it was for Martinez's wife to deal with the changes in her husband.

We find that the above evidence was factually sufficient for the jury to award damages to Mrs. Martinez.

■ Finally, Appellant challenges the damage awards assessed for each of the children. The damages recoverable by children for loss of parental consortium include loss of the parent's "love, affection, protection, emotional support, services, companionship, care and society." *Reagan v. Vaughn,* 804 S.W.2d 463, 467 (Tex.1990). In determining the amount of damages, the jury may consider the severity of the injury, the effect on the parent-child relationship, the child's age, and the nature of the child's relationship to the parent. *Id.*

■ Martinez's oldest son, Robert, testified that his dad no longer acted the same and that he was afraid of his dad. Robert also stated that Martinez was not "fun" anymore; he was often angry with the boys and hit them, something that Martinez had not done prior to the accident. Robert verified that he was 11 years old at the time of trial and his younger brother, John, testified that he was 8 years old. Mrs. Martinez reiterated that her husband became angry with the boys easily and that she could not trust

Martinez to stay alone with his sons. She testified about several occurrences where Martinez had discussed very inappropriate topics with the boys and encouraged unacceptable behavior. Mrs. Martinez also testified that her husband, prior to the accident, was very involved with the boys and always took them on family outings to places such as the zoo or the beach.

Based on the evidence presented, we find that there was factually sufficient evidence for the jury to assess damages at $1 million for each child, considering their age and the drastic change in the relationship and support they can expect to receive from their father for the remainder of their lifetimes.

### 8. Conclusion

In sum, we affirm the trial court's judgment in so far as it relates to the awards of actual damages for Martinez, Juanita Martinez and Robert and John Martinez. We reverse and render that part of the judgment awarding exemplary damages and hold that Appellee take no exemplary damages. All other aspects of the judgment are affirmed.

GREEN, Justice, dissenting.

The jury's verdict of no negligence or causation on the part of the plaintiff and the other defendants is so against the great weight and preponderance of the evidence that it is manifestly unjust. The case should be reversed and remanded for a new trial. Therefore, I respectfully dissent.

It is unchallenged that the tire in question exhibited adequate warnings against the very conduct of the plaintiff that caused the accident in which he was injured. That the plaintiff ignored the warnings is conclusive proof of his negligence.

There is also conclusive evidence of contributing causation on the part of appellant's co-defendants, Ford and Budd. The evidence was undisputed that Ford and Budd had introduced 16.5″ wheel rims into a marketplace where 16″ tires were common, posing a potential for great harm to both the installers and users of 16″ tires. There was also evidence that the rims were defective because they were not conspicuously marked as 16.5″ rims, and that the defect was a cause of the accident. Evidence was introduced that the rims could easily have been designed in such a way to reject mismatched tires.

In support of the verdict, the majority disregards the great weight of the evidence of Ford and Budd's causation, concluding that the jury was entitled to rely on the fact that the tire was the only product to "fail" in finding Goodrich 100% at fault. But it is clear from the evidence that the only reason the tire failed was because it was placed on a defective and mismatched rim. It did not fail because of a self-contained defect.

The greater weight and preponderance of the evidence establishes that the plaintiff, Ford and Budd were each, to some undetermined degree, the cause of the plaintiff's injuries. Accordingly, I would reverse and remand the case for a new trial.