Monty CLAY, et al., Appellants

v.

AIG AEROSPACE INSURANCE
SERVICES, INC., et al.,
Appellees

No. 06–15–00024–CV

Court of Appeals of Texas,
Texarkana.

Submitted: February 1, 2016

Decided: March 31, 2016

M. Keith Dollahite, M. Keith Dollahite, PC, Tyler, TX, Robert Waltman, Waltman & Grisham, Bryan, TX, D. Bryan Hughes, Law Office of D. Bryan Hughes, Mineola, TX, Michael A. Simpson, Simpson Boyd Powers & Williamson, Bridgeport, TX, William Angelley, Braden, Varner & Angelley, PC, Dallas, TX, for appellant.

Ross Cunningham, G. Don Swaim, Steven D. Sanfelippo, Cunningham Swaim, LLP, Dallas, TX, for appellee.

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Opinion by Chief Justice Morriss

A small, private aircraft crashed, killing both the pilot, Dale "Scooter" Phillips, Jr., and his passenger, Amy Clay. Their estates and families (collectively, the Appellants) sued AIG Aerospace Insurance Services, Inc. (AIG), alleging that it was strictly liable and negligent because it failed to provide adequate warnings when it sold an unrepaired salvage aircraft with its included engine to a third party, who subsequently placed the engine and vacuum pump taken from that salvaged aircraft back into the stream of commerce, where it ended up in Phillips' airplane. After a jury trial, the jury found that AIG was not in the business of selling aircraft engines and vacuum pumps and, in effect, that Phillips' negligence was the sole proximate cause of the crash. Pursuant to the jury's findings, the trial court entered a take-nothing judgment in favor of AIG.

Appellants argue that there was factually insufficient evidence to support the jury's finding that AIG was not in the business of selling aircraft engines and vacuum pumps, that there was factually insufficient evidence to support the jury's negligence findings, that the trial court improperly commented on the evidence when a former astronaut was called as a witness, and that the trial court erred when it failed to provide the jury Appellants' requested instruction regarding the "as is" clause.[1]

We affirm the trial court's judgment because (1) the jury's finding regarding AIG's business was supported by factually sufficient evidence, (2) the jury's finding that AIG's negligence, if any, did not proximately cause the accident was supported by factually sufficient evidence, (3) the trial court's comments regarding witness Gibson were not improper, and (4) the trial court was within its discretion in refusing to add Appellants' requested language to the "as is" jury instruction.

AIG had insured a Piper PA–32–250 aircraft, registration number N33033, owned by JAG Components, Inc. (JAG). The insured value of the aircraft was $100,000.00. In October 2005, the aircraft was severely damaged by a hurricane. The AIG claims adjuster determined that the aircraft was a "total loss," as the cost to repair the aircraft exceeded its value, and paid JAG the insured value.

In November 2005, following its company practice, AIG offered the salvaged aircraft for sale on its salvage-sales website

to help offset the company's cost of paying the insurance claim. When sold through the website, each salvaged aircraft is sold as a single unit to the highest bidder. Though AIG did not inspect or examine the JAG aircraft sold through the website, its sales listing noted that the aircraft was a "[h]urricane loss" with damage to "[b]oth wings, all control surfaces, tail section, prop, fuselage, [and] cowling" and included photographs showing that it had flipped over, that the interior and exterior sustained extensive damage, and that the propeller had been bent. Potential bidders for the aircraft were given the claims adjuster's contact information and were informed that the aircraft was being sold "AS IS/WHERE IS."

Robert Ruhe, of Bob Ruhe AG Service, Inc., was the winning bidder at the price of $28,400.00 for the salvaged aircraft. In December 2005, Ruhe and his son, Eric, drove to Florida, picked up the salvaged aircraft from the storage facility where AIG had stored it, and hauled it back to Ruhe's home in Ohio. Included with the aircraft were a bill of sale, full set of maintenance records, photographs of the damage to the aircraft, as well as logbooks.[2] The logbooks made no reference to the hurricane damage.

Ruhe intended to rebuild the aircraft for his personal use, but he got too sick to ever work on it. Ruhe passed away in September 2008. The aircraft sat in a garage for several years.

---

1. At trial, AIG filed a motion for directed verdict on the theory that AIG owed Appellants no duty that could support either a negligence or strict liability claim against AIG. That motion was denied. On appeal, AIG urges a cross-point that the trial court erred by denying AIG's motion for directed verdict. Because we reject all of Appellants' points of error, we need not reach AIG's cross-point.

2. A propeller aircraft usually has three logbooks, one for the airframe, one for the engine, and one for the propeller. The logbooks generally "move forward with the aircraft" in the event it is sold or sold in pieces.

In August 2011, Eric Ruhe sold the engine from the salvaged aircraft to Air–Tec for $6,000.00, which was, according to Eric, about half the cost of a used engine that did not require an overhaul. Eric testified that, before the sale, he orally informed Air–Tec's owner, Richard Waters, that the engine was not airworthy, that it was a "salvage" engine that had been in an aircraft that was flipped over and damaged in a Florida storm, and that it needed a complete overhaul because "it was sitting in a box for almost six years and it had never run." Eric testified that he sold the engine to Air–Tec "as is," though he had no documentation thereof. Eric further testified that the aircraft was obviously severely damaged and that it was clearly not airworthy because, in part, the craft and the engine had not been properly inspected and tested during the five years before the sale to Air–Tec.

Air–Tec's sole business is buying and selling Lycoming engines, the same type of engine in the salvaged aircraft. Waters testified that Eric did not tell him that the engine had been in a damaged or salvaged aircraft. Waters stated that Eric told him that there was "no damage on the engine whatsoever," that the engine was "perfect ... complete with all accessories except the alternator."

The engine was shipped to Air–Tec along with the engine's logbooks, which provided the engine's maintenance and inspection history. Waters described the logbooks as the "Bible" of the engine. There is no mention in the engine's logbooks that the engine, or aircraft of which it was a part, was salvaged or damaged by storm, wind, or water. However, the logbooks did mention that the engine had not undergone its FAA-mandated annual inspections for the previous six years, and it was determinable from the logbooks' contents that the engine's vacuum pump had

been in service for at least twelve years and that the pump had been operated for 636 hours. Air–Tec did not modify or overhaul the engine, as Waters testified that he inspected the engine and that "it looked perfect ... [a]nd going by the logbook, [he] didn't have any reason to take it apart."

Subsequently, Air–Tec advertised the engine for sale. Phillips contacted Waters and inquired about the engine. Based on the information in the logbook, and what Eric told Waters at the time of sale, Waters informed Phillips that the engine had not been run since August 2005 (the last entry in the logbook), that it had been 553 hours since its last overhaul, and also told him about the "[log]book, compression checks, everything." Phillips purchased the engine from Air–Tec for $9,000.00, and at Phillips' direction, Air–Tec shipped the engine and the logbooks to Phillips' mechanic, Carroll Aviation, Inc. It is undisputed that Carroll Aviation installed the engine in Phillips' personal aircraft, a Piper PA–24–250.

At about 7:21 p.m. on February 20, 2012, Phillips' Piper took off from Abilene Regional Airport (ABI), bound for the University of Oklahoma Westheimer Airport (OUN) in Norman, Oklahoma. Phillips was piloting the plane, and Amy Clay was his passenger. About thirteen minutes after takeoff, while the aircraft was 8,100 feet above the ground, Phillips told the control tower that he was going to turn the plane around and return to ABI, saying that "we've lost our suction and our attitude indicator." It is undisputed that, during the flight, the engine's vacuum pump failed, causing the attitude indicator instrument to fail. The control tower gave Phillips clearance to return, and Phillips informed the tower that he was "going to try to turn around." Phillips' last communication came at 7:35 p.m., when he con-

firmed he was operating under visual flight rules (VFR),[3] but he was "having trouble." The control tower informed Phillips that his "altitude appear[ed] to be ... going up and down pretty erratically" and that he had "lost a thousand feet in the last six seconds." At that time, the aircraft was only about 3,700 feet above the ground. The aircraft crashed into the ground about thirty seconds later, killing both Phillips and Clay.

*(1) The Jury's Finding Regarding AIG's Business Was Supported by Factually Sufficient Evidence*

■ Appellants contend that the evidence is factually insufficient to support the jury's finding that AIG was not engaged in the business of selling aircraft engines and vacuum pumps. We disagree.

■■ To prevail on a challenge that the evidence is factually insufficient to support an adverse finding on an issue on which the complaining party has the burden of proof, that party must show that the adverse finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam). The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony, and an appellate court must not merely substitute its own judgment for that of the jury. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex. 2003); *Marin v. IESI TX Corp.,* 317 S.W.3d 314, 334 (Tex.App.–Houston [1st Dist.] 2010, pet. denied), *abrogated on other grounds by Zorrilla v. Aypco Constr. II, LLC,* 469 S.W.3d 143 (Tex.2015).

**3.** The record explains that, when flying under VFR protocols, a pilot must have at least

■ Texas courts follow the principles set out in Section 402A of the Restatement (Second) of Torts regarding strict-products-liability claims like the one filed by the Appellants. *New Tex. Auto Auction Servs., L.P. v. Gomez De Hernandez,* 249 S.W.3d 400, 403 (Tex.2008); *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 426 (Tex. 1997). Section 402A provides:

> (1) [O]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

*Grinnell,* 951 S.W.2d at 426; *see also* RESTATEMENT (SECOND) OF TORTS § 402A (Am. Law Inst.1965). To hold a seller of a product liable, the product must reach the user in essentially the same condition as when it left the seller's possession. *Zavala v. Burlington N. Santa Fe Corp.,* 355 S.W.3d 359, 368 (Tex.App.–El Paso 2011, no pet.); *see also* RESTATEMENT (SECOND) OF TORTS § 402A cmt. g ("The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.").

Here, the jury was instructed that:

> The "business of selling" means involvement, as a part of its business, in selling, leasing, or otherwise placing in the course of commerce products similar to the products in question by transactions

three miles of visibility.

that are essentially commercial in character.

The jury question asked whether AIG was "engaged in the business of selling aircraft engines and vacuum pumps."[4] The jury answered, "No."

■ The Appellants contend that the jury's finding is against the great weight and preponderance of the evidence. They contend that AIG produced no evidence that it was not in the business of selling engines and vacuum pumps. Appellants point to testimony of Edward Green, AIG's regional manager that, in 2005, AIG was "a seller of a salvaged aircraft." The evidence established that, in the three years before that sale to Ruhe, AIG sold 1,140 aircraft for about $17.7 million, but the evidence was undisputed that AIG sold only whole aircraft, as there was no evidence that AIG sold aircraft engines or vacuum pumps separately or independent of a salvaged aircraft.[5]

From the conflicting evidence on this issue, the jury, as the sole trier of fact and judge of credibility could have reasonably determined that AIG was not in the business of selling aircraft engines and vacuum pumps. *See Jackson*, 116 S.W.3d at 761; *Marin*, 317 S.W.3d at 334. Therefore, we find that the jury's finding is neither against the great weight and preponderance of the evidence, nor so weak as to be clearly wrong or unjust. Accordingly, we overrule this point of error. *See D. Hous-*

*ton, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002); *Uniroyal Goodrich Tire Co. v. Martinez*, 928 S.W.2d 64, 68 (Tex.App.–San Antonio 1995), *aff'd*, 977 S.W.2d 328 (Tex.1998).

**(2) The Jury's Finding that AIG's Negligence, if any, Did Not Proximately Cause the Accident Was Supported by Factually Sufficient Evidence**

■ In Question Five, the jury was asked:

Did the negligence, if any, of those named below proximately cause the occurrence or deaths in question?

Answer "Yes" or "No" for each of the following:

1. AIG
2. The Ruhes
3. Air–Tec, Inc.
4. Scooter Phillips

The jury answered, "No," as to AIG, the Ruhes, and Air–Tec, but answered, "Yes," as to Phillips. In their third point of error, the Appellants argue that the evidence was factually insufficient to support the findings regarding AIG and Phillips.

The standard of review for factual sufficiency was stated above.

■ The essential elements of actionable negligence are the existence of a duty on the part of one person to protect anoth-

---

**4.** It would appear that the issue was framed in terms of whether AIG was in the business of selling engines and vacuum pumps as isolated products, because, framing the issue as whether AIG was a seller of salvaged aircraft would cause Appellants' claim to founder over the rather obvious problem that the aircraft was never intended to be used by a user or consumer in the condition in which it was sold by AIG.

**5.** Appellants also argue that, in AIG's pleadings, it stated, and thereby judicially admit-

ted, that it is a "nonmanufacturing seller" and that "AIG is a 'seller' under that statute solely for the purposes of § 82.002, and not for any other purposes, including Texas product liability law." However, Appellants have waived this argument because they failed to object to both the introduction of evidence to the contrary and the submission of a jury question on whether AIG was in the business of selling aircraft engines and vacuum pumps. *See Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762 (1987).

er against injury, a breach of that duty, and an injury to the person to whom the duty is owed as a proximate result of the breach of duty. *Love*, 92 S.W.3d at 454; *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 376 (Tex.1984); *Martinez*, 928 S.W.2d at 68. The law imposes a duty to exercise ordinary care in any circumstance where it is foreseeable that harmful consequences may result from a particular conduct. *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 295 (Tex.1983). Standards within an industry should be considered, but are not dispositive, on what constitutes ordinary care. *Milner v. Huntsville Mem'l Hosp.*, 398 S.W.2d 647, 652 (Tex.Civ.App.–Houston 1966, writ ref'd n.r.e.); *Brown v. Lundell*, 334 S.W.2d 616, 619 (Tex.Civ.App.–Amarillo 1960), *aff'd*, 162 Tex. 84, 344 S.W.2d 863 (Tex.1961).

Here, when AIG offered the entire salvaged aircraft for sale, as-is, it disclosed to potential bidders that it was damaged in a hurricane, suffering damage to the wings, control surfaces, tail section, propeller, fuselage, and cowling, and its sales listing included photographs showing that the aircraft was flipped over and the propeller bent. It is undisputed that AIG did not record the hurricane damage or propeller strike in the logbooks.

Eric testified that, when he and his father bought the aircraft, it came with the logbooks and maintenance records, and that he was aware that the aircraft was severely damaged and not airworthy. Eric also testified that, when he sold the engine and its logbook to Air–Tec, he informed Waters that it was a salvaged engine that needed a complete overhaul. However, Waters testified that Eric told him that the engine was undamaged and in perfect condition, and Air–Tec later sold the engine to Phillips, who had it installed into his aircraft without first performing a complete overhaul of the engine.

It is undisputed that, during the flight, the engine's vacuum pump failed, causing the attitude indicator instrument to fail. Dr. Robert Block, a metallurgical engineer, testified that, when the propeller was struck during the hurricane, the force was transferred through the crankshaft that powered the vacuum pump, thereby damaging the pump in a way that eventually caused it to fail. Lee Coffman, a certified FAA mechanic and inspector, agreed with Block that the vacuum pump could have been damaged when the propeller was struck and bent during the storm. Coffman also testified that water or debris entered the vacuum pump when the salvaged aircraft was left upside-down for several weeks after the hurricane and that that contamination, along with the impact damage from the propeller, led to the vacuum pump's failure. However, one of AIG's experts, Kenneth Orloff, an aviation accident consultant and reconstructionist, testified that, in his expert opinion, there was "absolutely no way that the damage to the propeller during Hurricane Wilma ... had any effect on the vacuum pump at all."

The Appellants contend that AIG knew or should have known that the engine had been damaged and the propeller struck during the hurricane and that AIG was negligent for failing to provide a proper warning of that damage in the logbook. They allege that AIG's failure to provide an adequate warning in the logbooks caused the eventual buyer of the engine, Phillips, to have the engine installed into his aircraft without performing a complete overhaul of the engine and therefore proximately caused the deaths of Clay and Phillips.

The Appellants' experts, Michael Gallagher and Lee Coffman, testified that a reasonably prudent insurance company would have recorded the hurricane damage and propeller strike in the logbook and

that other insurance companies have done so. However, on cross-examination, Gallagher admitted that AIG's bid sheet and sale photographs, which disclosed damage to the propeller, was also part of the aircraft's maintenance records, and that AIG properly provided the applicable aircraft and engine records to the next purchaser, the Ruhes. Edward Green, AIG's regional manager, testified that there is "no industry standard of what is put into a logbook with respect to salvaged aircraft." Green and AIG's expert witnesses testified that damage and salvage entries are not customary in the industry, that the FAA does not require that actual engine damage, let alone likely engine damage, be noted and recorded in the logbooks, and that whomever returned the engine into service had the duty of ensuring the engine was safe and airworthy.

The Appellants also claim AIG failed to comply with an FAA airworthiness directive "that if a prop strike occurred to this type of Lycoming engine, the engine must be inspected per the manufacturer's service bulletin" and that, without a note in the logbook that the propeller had been struck, downstream purchasers would have no other way to know of the potentially dangerous condition caused by the propeller strike. However, the Appellants' own expert, Gallagher, admitted that the directive did not apply to AIG because AIG was not returning the aircraft to service.[6]

Here, the jury found that AIG's negligence, if any, did not proximately cause

the deaths of Clay and Phillips. While the evidence was clear that AIG did not have to comply with the FAA airworthiness directive, there was conflicting evidence regarding whether it was ordinary care to note the damage in the logbook. From the conflicting evidence, the jury could have reasonably concluded that AIG was not negligent in its actions or that there was no proximate cause.[7] *See Jackson*, 116 S.W.3d at 761; *Marin*, 317 S.W.3d at 334. We find that the jury's finding is neither against the great weight and preponderance of the evidence, nor is it so weak as to be clearly wrong or unjust. Accordingly, we overrule this point of error. *Love*, 92 S.W.3d at 454; *Martinez*, 928 S.W.2d at 68.

Having found factually sufficient evidence to support the jury's finding regarding the alleged negligence of AIG, the issue as to Phillips' negligence is moot.[8]

### (3) The Trial Court's Comments Regarding Witness Gibson Were Not Improper

 Appellants also contend that the trial court improperly commented on the evidence regarding a "celebrity" witness.

The last witness to be called during the trial was Robert "Hoot" Gibson, AIG's primary expert witness on the negligence-related issue of pilot error. When Gibson was called to the stand, the following exchange occurred:

---

**6.** The Appellants also argued that AIG failed to comply with an aviation regulation requiring the registered owners of an aircraft to keep records of the current status of applicable airworthiness directives and safety directives, but Gallagher testified, and the Appellants admit, that the regulation did not apply to AIG because AIG was never the registered owner of the salvaged aircraft.

**7.** In a cross point, AIG asserts that it owed no duty to Phillips or to Clay. Whether a duty to warn third parties exists is a question of law reviewed de novo. *Grinnell*, 951 S.W.2d at 426. Because of our holdings in this opinion, we need not reach the legal question of duty.

**8.** Even if this issue were not moot, there is great a deal of conflicting evidence regarding whether Phillips' negligence, if any, proximately caused the crash.

[BY AIG]: Your Honor, we call Hoot Gibson.

THE COURT: I've heard that name before. Mr. Gibson, come on up and let me get you sworn in. I've been wanting to meet you for years.

(Witness sworn.)

THE COURT: Please have a seat.

[BY AIG]:

Q. Mr. Gibson, can you introduce yourself to the judge and to the jury.

A. Yes, sir.

THE COURT: But you might really want to do it to the jury.

Gibson went on to describe his flight experience and qualifications. The Appellants did not object to the trial court's comments.[9]

Our judicial system denies the right of a trial judge, in the presence and hearing of the jury, to comment on the credibility of a witness or the weight to be given testimony. *See Price v. State,* 171 Tex.Crim. 248, 347 S.W.2d 616, 617 (Tex. Crim.App.1961). The Appellants contend that the trial court's comments improperly boosted Gibson's credibility.

To preserve a complaint for appellate review, the complaining party must make a timely objection, motion, or request to the trial court. TEX.R.APP. P. 33.1(a)(1). Appellants did not object to the trial court's comments until their motion for new trial. *See Francis,* 46 S.W.3d at 241. "[A]n objection to improper conduct or comment on the part of the court in the trial of the case generally must be made at the time of the occurrence if the error is to be preserved for appellate review unless the conduct or comment is of a character that cannot be rendered harmless by proper instruction." *State v. Wilemon,* 393 S.W.2d 816, 818 (Tex.1965); *see also Smith*

*v. Henson,* 270 S.W.3d 673, 675–76 (Tex. App.–Fort Worth 2008, pet. denied). In determining whether the trial court's comments were erroneous or so harmful as to be incurable by instruction, we examine the entire record. *Francis,* 46 S.W.3d at 241.

Immediately after the court's comments, Gibson stated his name for the record and testified that, after graduating from college with a degree in aeronautical engineering, he joined the Navy, where he became a fighter pilot, flying F–4 Phantoms and F–14 Tomcats, as well as flying combat missions in Vietnam. In 1978, NASA selected him for the first space shuttle class of astronauts. He went to space five times on the space shuttle, the first as the copilot and then four times as the captain, spending thirty-six days in space. In eighteen years there, he logged over 3,000 hours flying NASA's T–38 jets. After leaving NASA, he was a pilot for Southwest Airlines until he reached mandatory retirement age. Gibson ultimately testified that, even without a functioning attitude indicator, Phillips should have been able to safely turn the aircraft around and return to ABI and that Phillips' negligence caused the crash in question.

The Appellants contend that the comments boosted Gibson's credibility "by communicating to the jury that Gibson was famous and preeminent authority ... had special importance to the judge ... and the jury should pay close attention to Gibson's qualifications as an expert." They point out that Gibson was the last witness to testify and that he was present and visible as a part of AIG's litigation team for all five days of the trial.

The Appellants cite to *Thompson v. Janes* where, in response to an objection

---

9. Appellants first raised the issue in their motion for new trial.

that a witness was not qualified to express an opinion, the trial court stated, "I believe this witness would be better qualified to answer the question than anybody else, I know of, certainly better qualified than a stranger to [Janes]...." *Thompson v. Janes*, 227 S.W.2d 330, 331 (Tex.Civ.App.–Austin 1950, no writ). The appellant promptly objected, arguing that the trial court had commented on the weight of the evidence, but the trial court overruled the objection. *Id.* The court of appeals held that the comment was reversible error because the trial court indicated that the proffered witness knew more about a disputed issue than anyone else. *Id.* at 332. However, the facts of the case before us differ from those of *Thompson* because the Appellants in this case failed to object, and therefore, the facts must show that the trial court's comments were so egregious as to be incurable by instruction.

Here, it appears that the trial court had wanted to meet Gibson because he was a former NASA astronaut. The trial court's comments go to Gibson's notoriety, rather than his credibility as was the case in *Thompson*, and the trial court was within its discretion to direct the witness to introduce himself to the jury, rather than the court.[10] Therefore, in light of the record, the trial court's comments were not improper. Even if the comments were improper, the comments in this case were not so egregious as to be incurable by an instruction. *See id.* at 331; *see Francis*, 46 S.W.3d at 241; *Wilemon*, 393 S.W.2d at 818.

We overrule this point of error.

*(4) The Trial Court Was Within its Discretion in Refusing to Add Appellants' Requested Language to the "As Is" Jury Instruction*

When AIG originally sold the salvaged aircraft, it was sold "AS IS/WHERE IS." In their final point of error, the Appellants contend that the trial court erred by not giving the jury their proffered instruction regarding the "as is" clause.

An instruction is proper if it might assist the jury in answering the submitted questions, accurately states the law, and finds support in the pleadings and evidence. Tex.R. Civ. P. 277; *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex.1992); *Wal–Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468, 470 (Tex.App.–San Antonio 1998, pet. denied); *La. & Ark. Ry. Co. v. Blakely*, 773 S.W.2d 595, 598 (Tex.App.–Texarkana 1989, writ denied). A trial court is afforded more discretion when submitting instructions than when submitting questions. *Middleton*, 982 S.W.2d at 470. Since the trial court has considerable discretion to determine necessary and proper jury instructions, we review a trial court's decision to refuse a particular instruction under an abuse of discretion standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex.2006); *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex.2000); *Blakely*, 773 S.W.2d at 598. An abuse of discretion occurs where a trial court acts arbitrarily, unreasonably, without consideration of

---

10. Texas courts have held that "the discretion vested in the trial court over the conduct of a trial is great." *Schroeder v. Brandon*, 141 Tex. 319, 172 S.W.2d 488, 491 (1943); *see Metzger v. Sebek*, 892 S.W.2d 20, 38 (Tex. App.–Houston [1st Dist.] 1994, writ denied). A trial court has the authority to express itself in exercising this broad discretion. *Bott v. Bott*, 962 S.W.2d 626, 631 (Tex.App.–Houston [14th Dist.] 1997, no writ). Further, a trial court may properly intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time. *Hoggett v. Brown*, 971 S.W.2d 472, 495 (Tex.App.–Houston [14th Dist.] 1997, pet. denied); *Great Global Assurance Co. v. Keltex Props., Inc.*, 904 S.W.2d 771, 777 (Tex.App.–Corpus Christi 1995, no writ).

guiding principles, or clearly fails to analyze or apply the law correctly. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985); *Middleton*, 982 S.W.2d at 469.

 When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, we first determine if the instruction was reasonably necessary to enable the jury to render a proper verdict. *Shupe*, 192 S.W.3d at 579; *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex.2000) (referring to Tex.R. Civ. P. 277, 278). The trial court should refuse to submit an unnecessary instruction even if it correctly states the law. *Blakely*, 773 S.W.2d at 599. Well-settled pattern jury charges should not be embellished with addendum. *Weeks Marine, Inc. v. Salinas*, 225 S.W.3d 311, 319 (Tex.App.–San Antonio 2007, pet. dism'd).

The omission of an instruction is reversible error only if the complaining party establishes that the omission probably caused the rendition of an improper judgment. Tex.R.App. P. 44.1(a); *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex.2003). Any error in the omission of an instruction is harmless "when the findings of the jury in answer to other issues are sufficient to support the judgment." *Shupe*, 192 S.W.3d at 579–80 (quoting *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex.1980)).

Here, the trial court provided the following jury instruction: "An 'As Is' or an 'As Is / Where Is' clause in a contract is legally binding only on the parties to that contract." The trial court denied the Appellants requested instruction, which read, "An 'As Is' or an 'As Is / Where Is' clause in a contract is legally binding only on the parties to that contract. The clause does not have any effect on a person who is not a party to the contract containing the clause."

When a requested instruction is merely a rephrasing, embellishment, or repetition of an instruction already given in the charge, the trial court is within its discretion to refuse it. *See Davis v. State*, 651 S.W.2d 787, 792 (Tex.Crim.App.1983) (no harm shown when refused charge is adequately covered by charge given); *Riley v. State*, 802 S.W.2d 909, 910 (Tex. App.–Fort Worth 1991); *Blakely*, 773 S.W.2d at 599. Here, the trial court sufficiently instructed the jury regarding the meaning and applicability of the "as is" clause. Because the second sentence of the rejected instruction is merely a rephrasing or repetition of what was already encompassed in the court's charge, the trial court was within its discretion to reject it. *See Shupe*, 192 S.W.3d at 579; *Blakely*, 773 S.W.2d at 599. Accordingly, we overrule this point of error.

We affirm the trial court's judgment.